UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

**ROCHELLE TARLOWE**, and **SETH JONAS,**
collectively and individually, and on behalf of **ZACHARY**          COMPLAINT
**JONAS,** a minor,

                                  Plaintiffs,

       -against-                                                                ECF CASE
                                      Case No. 07 Civ. 7936

**NEW YORK CITY BOARD OF EDUCATION,**
d.b.a. **NEW YORK CITY DEPARTMENT OF**
**EDUCATION,** and **JOEL KLEIN,**                                        Assigned Judge: GEL
in his official capacity as Chancellor of the New
York City School Districts

                                  Defendants.
------------------------------------------------------------------x

Plaintiff, by their attorneys, Jesse Cole Foley, Esq., Law Offices of Skyer, Castro, Foley,

and Gersten, allege as follows

## PRELIMINARY STATEMENT

1.  This action is brought on behalf of Zachary Jonas (the "student") by Rochelle

Tarlowe and Seth Jonas (the "Parents") challenging the May 11, 2007 decision of a State

Review Officer, an employee and agent of the New York State Education Department,

which denied their request for full tuition reimbursement.  The State Review Officer

found the Defendant New York City Department of Education (hereinafter

"Department") provided Zachary with a Free Appropriate Public Education (hereinafter

"FAPE") for the 2006-2007 academic year, and that the Parents' unilateral placement

was not an appropriate placement for Zachary.  The State Review Officer's decision is

arbitrary and capricious and it violates the Individuals with Disabilities Education Act

(hereinafter "IDEA") and the laws of the State of New York, which require that children

with disabilities receive a Free Appropriate Public Education ("FAPE")[1].  To remedy this

violation of law, Rochelle Tarlowe and Seth Jonas bring this action pursuant to New

York Education Law Sect. 4404.3 and the IDEA, 20 U.S.C. Sec. 1415(e)(2).

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over the subject matter of this proceeding pursuant to

20 U.S.C. Sec. 1415 and 28 U.S.C. Sec. 1331.

3.  Venue lies in this District pursuant to 28 U.S.C. Sec. 1391(b)(2).  Pursuant to the

IDEA, a party aggrieved by the findings and decisions of a state educational agency may

challenge the determination in any State court of competent jurisdiction or in a United

States District Court.

4.  As the Second Circuit held[2],

> "[t]wo issues are relevant to a federal court's review of a challenged
> I.E.P.[3]: (1) whether the state complied with the procedural requirements of
> IDEA. and (2) whether the challenged IEP was "reasonably calculated to
> enable the child to receive educational benefit."

5.  As the Supreme Court held, in deciding whether tuition reimbursement is

appropriate, the Court shall determine whether the Department is required to pay for

educational services obtained for student by his or her parent, based upon whether: (1)

services offered by board of education were inadequate or inappropriate; (2) services

selected by parent were appropriate; and (3) equitable considerations support parents'

---

*1 The decision of State Review Officer is annexed hereto as Exhibit A.*

*2(Walczac v. Florida Union Free School District , 142 F. 3d. 119, 129 (2d. Cir. 1998), citing Board of
Education v. Rowley, 458 U.S. 176, 206-07 (1982)).*

*3An Individualized Education Plan (IEP) is a "written statement" that addresses the educational needs of a
child with a disability (20 U.S.C. § 1401[14]; 34 C.F.R. § 300.340[a]; 8 NYCRR 200.1[y]).*

claim. (School Comm. of Burlington v. Department of Ed. of Mass., 471 U.S. 359 (1985).)

## STANDARD OF REVIEW

6.  The Court is to receive and review the records of the administrative proceeding and shall hear additional evidence at the request of a party. The decision is based on the preponderance of the evidence. *The Court is to grant such relief as it deems appropriate, and its judgment is to be made independent of the administrative findings.*  20 USC § 1415(e)(2).

7.  As stated by the Rowley Court:

> "Congress expressly rejected provisions that would have so severely restricted the role of reviewing courts. In substituting the current language of the statute for language that would have made state administrative findings conclusive if supported by substantial evidence, the Conference Committee explained that courts were to make **independent decision(s) based on a preponderance of the evidence.** [4]"

## PARTIES

8.  Plaintiffs Rochelle Tarlowe and Seth Jonas are the parents of Zachary, a child with a disability who resides in New York City.

9.  Zachary is a six year old youngster with a diagnosis of Pervasive Developmental Disorder, Not Otherwise Specified ("PDD-NOS").  Zachary presents with delays in communication, however, is verbal and very expressive, and has further been diagnosed with verbal apraxia. (See Tr. at 153-56; 199)

---

*4* S. Cong. Rep. No. 94-455, supra, at 50. See also 121 Cong. Rec. 37416 (1975), remarks of Sen.Williams. Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, at 205 (1982).

10.  Upon information and belief, the Defendant the New York City Department of Education ("Department") is the newly formed official body charged with responsibility for developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  N.Y. Educ. Law Sects. 2590, 2590-g (McKinney 2005).  The Department is a recipient of federal financial assistance.

11.  Upon information and belief, the Defendant the New York City Board of Education ("Board") was or continues to be the official body charged with the responsibility for developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities. N.Y. Educ. Law Sects. 2590, 2590-g (McKinney 2005).  The Board is a recipient of federal financial assistance.

12.  Defendant Joel Klein is the Chancellor of the New York City School District ("the Chancellor") and as such is entrusted with the specific powers and duties set forth in  N.Y. Educ. Law Sect. 2590-h (McKinney 2005).

13.  The New York City School District, in accordance with the Individuals with Disabilities Education Act ("IDEA") and Article 89 of the New York State Education Law ("Article 89"), is responsible for providing a FAPE to New York City resident students, between the ages of 3 and 21, who have been classified as children with disabilities in need of special education programs and services. 20 U.S.C. §1400 et seq.; N.Y. EDUC, LAW §4401 – 4410-a (McKinney 2005).

**PROCEDURAL HISTORY**

16.  Pursuant to the I.D.E.A. Sec. 1415 and New York Education Law Sec. 4404, the Parents filed an impartial hearing request on or about August 15, 2006, challenging the educational program designated by the Committee on Special Education [hereinafter, "CSE"] of the Department and seeking full tuition reimbursement for the 2006-2007 school year for their unilateral placement of Zacharty at the Forum School, a placement approved by the State of New Jersey and with which school districts in New York State regularly contract with.

17.  In a decision dated January 9, 2007, the state certified Impartial Hearing Officer held, in his Hearing Officer's Findings of Fact and Decision (hereinafter the "Decision") that the services offered by the Department were appropriate to convey an educational benefit to Zachary. (Decision at 9).

18.  Pursuant to an administrative appeal taken by the Parents challenging the decision, the State Review Officer dismissed the appeal.  The State Review Officer found that the IEP was reasonably calculated to enable the child to receive educational benefit and that the parents' unilateral placement, the Forum School, does not appropriately address Zachary's special Education needs. (*See generally* Decision of the State Review Officer).

19.  Both the Hearing Officer and the State Review Officer erroneously denied full reimbursement for the 2006-2007 school year, notwithstanding the inappropriateness of the Department's recommended placement, the appropriateness of the Parents' unilateral placement at The Forum School, and the equitable considerations weighing in favor of the Parents' claim.

20.  The Hearing Officer and the State Review Officer both erred by not properly considering the substantial and preponderance of real and testimonial evidence presented at the Impartial Hearing and in the subsequent appeal. The substantial real and testimonial evidence overwhelmingly support the fact that (i) the Department failed to offer Zachary a Free and an Appropriate Public Education (FAPE); (ii) the unilateral placement at The Forum School conferred an educational benefit to Zachary; and (iii) the equities weighed in favor of the Parents' claim for full tuition reimbursement.

## FACTUAL ALLEGATIONS

21.  Plaintiffs, Rochelle Tarlowe and Seth Jonas, are the parents of Zachary Jonas ("student"), a six-year-old.  As a result of a review meeting and IEP developed in the Spring of 2006, the CSE has classified Zachary as a child with Autism.

22.  The parents disagree with this classification, and maintain that that a determination as to the classification and placement recommendation was made prior to the beginning of the CSE review. (Tr. at 219)

23. Moreover, the parent testified that Zachary's classification of Autism was determined solely by his current diagnosis of Pervasive Developmental Disorder, a diagnosis for which the CSE felt that is was mandated to make a classification of Autism. (Tr. at 220-221).

24.  The student has exhibited special education needs throughout his academic life.

25. Zachary was diagnosed with Pervasive Developmental Disorder-Not Otherwise Specified at the age of two and one half.  Zachary presents with delays in communication, having been further diagnosed with verbal Apraxia.  (Tr. at 141-143; 153-156).

26.  Initially, the professionals who were consulted were hesitant to diagnose Zachary because the severity of his deficits was on the borderline range. (Tr. at 201)

27.  Zachary received services through both Early Intervention as well as under the auspices of the Committee on Preschool Education ("CPSE".)[5]

28.  Zachary made a significant amount of progress in his preschool program between March 2006 and June 2006, specifically in the areas of communication, activities of daily living and social dynamics. (Tr. at 154-5.)  Such gains are typical for students with PDD and are important to acknowledge with regard to the placement process.

29.  On May 23, 2006 a CSE meeting was held to discuss the educational needs of, and develop an Individualized Education Program ("IEP") for, Zachary Jonas in which the Parents attended and fully participated and cooperated.

30.  The CSE review resulted in a classification of Autism and placement was recommended in a special class in a specialized school with a 6:1:1 student to teacher ratio. (Parent's Exh. B)

31.  The parents believed that a determination was made as to the classification and placement recommendation prior to the start of the meeting. (Tr. at 219.)

32.  Subsequent to the meeting the parents were notified that they would be receiving a Final Notice of Recommendation ("FNR") which would direct them to a specific site where Zachary would attend school during the 2006-2007 academic year. (Tr. at 182).

33. On June 20, 2006, the parents received a telephone call from the CSE's placement office notifying them that they should have received a placement letter, however the

---

5 Zachary initially attended a typically developing preschool with the support of a Special Education Itinerant Teacher ("SEIT") before transitioning into a center based preschool program at the CDC in the Spring of 2005. (Tr. at 146-8).

placement recommended on that notice was incorrect.  The parents were directed to follow up with another school, P.S. 811M. (Tr. at 83).

34.  The parents did not receive this notice until the July 4th Holiday weekend. (Tr. at 184).

35.  The parents made several attempts to contact the school recommended for Zachary, and were finally notified that the site had closed and was being moved to a new location for the 2006-2007 academic year. (Tr. at 186-7).

36.  Not one person was able to inform the Parents as to where this new site would be located, despite repeated attempts by the parents to obtain this information. (Tr. at 187).

37.  In August 2006, the parents were notified that the site recommended for Zachary was holding a one day orientation for new students on August 11, 2006, the last day of school for the 2006 summer session. (Tr. at 187).

38.  The Parents unilaterally placed Zachary at the Forum School for the 2006-2007 school year. (Tr. at 251-53).

39.  The cost of attendance at the Forum School from for the 2006-2007 academic year was $37,719 and the Parents paid the school in ten installments. (Tr. at 253; 187)

40.  The Forum School was reasonably calculated to offer Zachary an appropriate educational opportunity, and he has shown improvements in many areas at the Forum School since September 2006. (See Tr. 440-448).

41.  The Parents consistently cooperated with the CSE, made Zachary available to the CSE for any requested testing, attended all CSE meetings, and provided the CSE with extensive private evaluations and progress reports.

**AS AND FOR A FIRST CLAIM**
**THE PARENTS RESPECTFULLY ALLEGE:**


**THE RECORD EVIDENCE OVERWHELMINGLY DEMONSTRATES THAT**
**THE STATE REVIEW OFFICER INCORRECTLY HELD THAT THE CSE**
**PROVIDED ZACHARY WITH A FREE APPROPRIATE PUBLIC EDUCATION**
**AS REQUIRED BY THE IDEA.**

Statutory Background.


42.  The IDEA ensures "children with disabilities have available to them a free

appropriate public education that emphasizes special education and related services

designed to meet their unique needs…." (20 U.S.C. § 1400(d)(1)(A).) New York State

participates in this statutory scheme through Article 89 of the New York State Education

Law, (hereinafter "Article 89"). ( N.Y. EDUC. LAW § 4401 et seq. (McKinney's 2005).)

The IDEA identifies students with specific disabilities that, by reason of their disability,

require special education and related services. (See 20 U.S.C. § 1401(3)(a)(i) and (ii)).

43.  Specifically, the IDEA defines a "child with a disability" as a child (i) with

mental retardation, hearing impairments (including deafness), speech or language

impairments, visual impairments (including blindness), serious emotional disturbance…,

orthopedic impairments, autism, traumatic brain injury, other health impairments, or

specific learning disabilities; and (ii) who, by reason thereof, needs special education and

related services. (Id.)

44.  Similarly, under New York State law, a "child with a handicapping condition" is

a person "who, because of mental, physical or emotional reasons can only receive

appropriate educational opportunities from a program of special education." ( N.Y.

EDUC. LAW § 4401(1)).

45. The specific disabilities covered by this definition, thirteen in all, are set forth in the corresponding Commissioner's regulation. (N.Y. COMP. CODES R. & REGS. Tit. 8, § 200.1(zz) (2002)).

46. Under both the IDEA and Article 89, a school district is obligated to identify each child within its jurisdiction who is suspected of having one of the specific educational disabilities.

47. Upon identification, the school district's CSE is required to conduct a multidisciplinary evaluation to assess the child in all areas related to his suspected disability.

48. Upon completion of the evaluation process, if the CSE determines that the child has an educational disability, as defined under the law, the *CSE* must then *timely recommend and provide an appropriate program recommendation* calculated to meet the needs of the child.

49. When a child is placed in a special education class, the *CSE must assure that such child is grouped with other children who have similar individual needs*. "The range of academic or educational achievement of such students shall be limited to assure that instruction provides each student appropriate opportunities to achieve his or her annual goals. The learning characteristics of students in the group shall be sufficiently similar to assure that this range of academic or educational achievement is at least maintained." (8 NYCRR 200.6 [a][3]).

50. All CSE reviews:

"<u>shall</u>…in the case of a student whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including behavioral interventions, and supports to address that behavior6"'

The CSE must conduct a formal Functional Behavioral Assessment ("FBA")7 followed by the development of a formal Behavior Intervention Plan ("BIP") [8].

51.  The Department must make Free Appropriate Public Education (FAPE) available to a child *"in a timely manner"* (20 U.S.C. § 1412[a][10][C][ii] (emphasis added)).  A FAPE is defined in relevant part as special education and related services that "[a]re provided in conformity with an IEP that meets the requirements of Secs. 300.340–300.350" (34 C.F.R. § 300.13[d]).

52.  At the beginning of each school year, a school district is required to have an IEP in effect "for each child with a disability in its jurisdiction" ( 20 U.S.C. § 1414[d][2][A]; see also 34 C.F.R. § 300.342[a]; <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 194 [2d Cir. 2005]) (". . . the District fulfilled its legal obligations by providing the IEP before the first day of school.").  The regulations specifically direct that a school district must have an IEP in place at the beginning of the school year (34 C.F.R. § 300.342[a]), and that the IEP must be in effect before special education and related services are provided (34 C.F.R. §300.342[b][1][i]).

53.  It is ultimately the district's obligation to devise an appropriate and timely program, regardless of whether the parents disagree with the program recommended.

---

6  *(8 NYCRR 200.4[d][3] [emphasis added], 8 NYCRR 2004.[f][1][i]; 34 C.F.R. § 300.346[a][2][i], 34 C.F.R. § 300.346[b]).*

7 *The purpose of an FBA is  to identify the problem behavior and contextual factors that contribute to the behavior, and then formulate a hypothesis with regard to the general conditions under which the behavior usually occurs and the probable consequences that serve to maintain it (8 NYCRR 200.1[r]);*

8  *The BIP must include a description of the problem behavior, global and specific hypotheses as to why such behavior occurs, and intervention strategies to address the behavior (8 NYCRR 201.2[a]).*

(see 34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section II, Question 9; Decisions of the Office of Review of New York State Education Department: Application of a Child with a Disability, Appeal No. 05-128 (2005), Application of a Child with a Disability, Appeal No. 04-093 (2004) [where parties disagree, district has the ultimate responsibility for developing an appropriate program]; Application of a Child with a Disability, Appeal No. 03-046 (2003) [same]; Application of the Bd. of Educ., Appeal No. 02-047 (2002); Application of a Child with a Disability, Appeal No. 00-084 (2000) [a CSE must recommend an appropriate program on a timely basis]).

54.  A school district may be required to pay for the educational services of a parent-initiated placement if the school district failed to recommend an appropriate program (i.e., FAPE) for the child, the services selected by the parents are appropriate, and equitable considerations support the parents' claim. (School Comm. of Burlington v. Department of Ed. of Mass., 471 U.S. 359 (1985).)

A. **The New York City Department of Education Failed to Have a Validly Constituted Committee on Special Education, Denying the Parents an Opportunity to Participate in the Development of Their Child's Individualized Education Program.**

**i. The State Review Officer Erroneously Held that a General Education Teacher Was Not Required to Attend the CSE Meeting because a General Education Environment was not Sought by Petitioners nor would have been Appropriate for Zachary.**

55.  An IEP prepared by a CSE that lacked each of its required members is a nullity.

(See Decisions of the Office of Review of New York State Education Department: Application of a Child with a Disability, Appeal No. 99-54;

Application of the Bd. of Educ., Appeal No. 99-38; Application of a Child with a Disability, Appeal No. 99-19).

56. The Committee on Special Education failed to include the participation of a General Education teacher in the initial "turning five" review held for Zachary Jonas (Tr. at 21).

57. The CSE failed to consider General Education for Zachary, despite the 2006-2007 school year being his first year in the public school system9. (Tr. at 48).

58. It was expected by the CSE that Zachary would participate with his general education peers in lunch, assemblies, trips and other school activities, yet the CSE failed to include the individual qualified to determine what degree of support would be necessary for him to do so, or to advocate for him to allow him to do so. (See Tr. at 50; See also Parents' Exhibit B, pg. 18)

59. The IDEA and its implementing regulations require that the CSE include "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment)" (20 U.S.C. § 1414[d][1][B][ii]; see 34 C.F.R. § 300.344[a][2])

60. Failure to include the participation of a general education teacher significantly compromises the ability of the CSE to develop an appropriate IEP and denies a child a Free and Appropriate Public Education. (See Decision of the Office of Review of New York State Education Department: Application of a Child with a Disability, Appeal No. 04-088).

_____

9 A Committee on Special Education must consider general education for all students with disabilities in compliance with the Least Restrictive Environment mandate of the IDEA.

61. The CSE's failure to include a general education teacher in the development of the CSE additionally seriously infringed on the Parents' ability to participate in the creation and formulation of the IEP, especially as the child was entering the school age CSE process for the first time. (See Decision of the Office of Review of New York State Education Department: <u>Application of a Child with a Disability</u>, Appeal No. 04-088).

62. The CSE's determination not to include a general education teacher shows a predisposition on the part of the Committee with regard to possible placement options.

**<u>ii. The State Review Officer Erred in Finding that the CSE Satisfied the Requirement to Secure the Attendance of a Special Education Teacher of the Child.</u>**

63. The Committee on Special Education failed to include the participation of an appropriate special education teacher. (Parents' Exhibit B2)

64. Ms. Shirley Melvin participated at the Special Education teacher at Zachary's CSE Review on May 24, 2006. (Tr. at 51).

65. Ms. Melvin was employed at the CSE office on a full-time basis during the 2005-2006 school year and continued to be employed at the CSE office on a full time basis during the 2006-2007 school year with no intention of working in any classroom environment, much less a District 75 citywide program for children classified with Autism. (Tr. at 51-2).

66. The U.S. Department of Education has indicated that "the special education teacher or provider of the child who is a member of the child's IEP team should

be the person who is, or will be, responsible for implementing the IEP." (See

Decision of the Office of Review of New York State Education Department:

Application of a Child with a Disability, Appeal No. 00-044)

67.  The State Review Office has held that without personal knowledge of the

student, and having only general knowledge of the recommended program, a

"special education teacher assigned" may not serve as the student's special

education teacher member of the CSE.  (See Decisions of the Office of Review of

New York State Education Department:  Application of a Child with a Disability,

Appeal No. 00-044; Application of a Child with a Disability, Appeal No. 00-

031).

**iii. The State Review Office Erred in Concluding that the Absence of the Requisite Parent Member for a Portion of the Meeting Failed to Result in a Denial of Educational Benefit for the Child.**

68.  The Committee on Special Education failed to include the participation of a

parent member throughout the May 24, 2006 CSE review.

69.  The parent member left halfway through the CSE Review (Tr. at 172).

70.  The parent member is a mandatory member of the review team, the

absence of whom renders the IEP void and nullifies any resulting program

recommendation.  (See Decision of the Office of Review of New York State

Education Department:  Application of a Child with a Disability, Appeal No. 00-

012)

71.  The State Review Officer has repeatedly held that the lack of a parent member at

the CSE meeting is a significant procedural defect.  (See Decisions of the Office

of Review of New York State Education Department:  <u>Application of a Child with a Disability</u>, Appeal No. 00-012; <u>Application of a Child with a Disability</u>, Appeal No. 99-2; <u>Application of the Board of Education of the North Rose-Wolcott Central School District</u>, Appeal No. 97-1).

72. State regulation requires that Individualized Education Program's be developed by a CSE that includes a parent member of a student with a disability residing in the school district or a neighboring school district (8 NYCRR 200.3 [a] [1] [viii]).

73. That the parent "testified that she felt comfortable speaking for herself and was provided with an opportunity to speak and put forth her position at the CSE meeting," (SRO Decision at 9) does not relieve the CSE of the requirement for an additional parent member of the CSE. (Education Law § 4402 [1][b][1][a][viii]).

B. **<u>The Committee on Special Education Relied on Evaluative Material that Failed to Properly Describe Zachary, thus Resulting in an IEP that Failed to Describe Zachary's Present Levels of Functioning.</u>**

i. **<u>The State Review Officer Erred in Finding that the Evaluation Report Relied Upon by the CSE Provides a Broader Representation of a Child's Strengths and Needs than the Abbreviated Subtest Scores Utilized for Children with Profound Language Deficits.</u>**

74. The IEP developed for Zachary fails to identify his current levels of functioning. (See Parents' Exhibit B)

75. The IEP developed for Zachary fails to identify his current levels of need. (Id.)

76. Dr. David Salsberg evaluated Zachary Jonas on April 21, 2006 and May 5, 2006 (See Parents' Exhibit D).

77. Dr. Salsberg was unable to utilize numerous subtests of the Wechsler Preschool and Primary Scale of Intelligence ("WPPSI-III") and the Stanford Binet Intelligence Scales ("SB5"), but was able to perform a cognitive screening using an abbreviated form of the SB5. (See. Tr. at 353-5)

78. On the SB5, Zachary obtained an abbreviated IQ score of 88, at the 21st percentile of functioning, within the low average range. (See Parents' Exhibit D3).

79. Zachary's score was significantly negatively impacted by his fund of vocabulary, measured as part of the Verbal Knowledge Factor, wherein he obtained a score at the 5th percentile. (Id.).

80. On the WPPSI-III, Zachary's scores were similarly affected by his language difficulties, which "negatively impact upon the assessment of other cognitive and academic skills." (Id.).

81. As such, pre-academic skills were unable to be fully tested, even though they were obviously emerging (Id.; See also Tr. at 353-6).

82. Overall, test scores do not accurately reflect Zachary's abilities and potential, as his reciprocal attention, processing and language deficits all significantly impact upon his ability to be formally assessed. (Parents' Exhibit D4).

83. Dr. Salsberg noted that Zachary "Demonstrated variable attention throughout the testing process and was generally able to work on non-verbal tasks for brief periods of time, while he was less persistent with verbal tasks.  He had significant difficulties with language skills. On all tasks, Zachary required repetition and, at times, rephrasing or oral instructions…Overall, he was able to work well within

this structured setting and demonstrates better **abilities** and potential than is evident, due to his significant language difficulties." (Parents' Exhibit D4, emphasis added).

84. Dr. Salsberg's scores were significantly different from those obtained by Dr. McCarton, who examined Zachary in December 2005. (Tr. at 356-7).

85. Dr. Salsberg testified that Zachary does not have the language or carryover to allow him to be impacted by the repeated administration of the SB5 over a period of five to six months. (Tr. at 373).

86. When the SB5 is administered, questions are asked until a child 'ceilings out,' answering four questions incorrectly. (Tr. at 375)

87. During the initial examination by Dr. McCarton, Zachary received scores of "0" on multiple subtests, as he was unable to understand the directions or responses needed from him10. (Tr. at 357; See also Parents' Exhibit E8).

88. Such a score would have exposed Zachary to no more than 6 questions. (Tr. at 357; see also Parents' Exhibit E8).

89. When Dr. Salsberg 'broke through' the language barrier by demonstrating to him what was required by the test, Zachary scored at the 63rd percentile, well within the average range. (Tr. at 357 – 358; see also Parents' Exhibits D3 and E8).

90. Dr. Salsberg testified that, although these IQ tests are non-verbal, they nevertheless contain verbal instructions, which Zachary cannot understand nor engage. (Tr. at 360).

---

10 Relying upon such scores to determine cognitive ability and make placement recommendations is as flawed as relying on an SAT score of 400, which one receives for writing her name, to determine academic potential.

91. Dr. Salsberg was able to show clearly that this was a child with profound language deficits that affected his relatedness, attention, and interaction skills, but has some good cognitive depth potential. (Tr. at 359-61).

92. The tests Dr. Salsberg utilized are established parts of the SB5 and are calculated, in the testing manual, to provide an abbreviated IQ for children with needs and abilities similar to Zachary and allows the potential of children with significant language impairment to be shown.  (Tr. at 360).

93. Without knowing the actual cognitive ability and potential of a child with such a severe language deficit, it is impossible to properly plan for proper educational placement.  (See Tr. at 362).

94. Dr. Salsberg ultimately recommended that Zachary be placed in a "small, highly structured, **language based** special education class."  (Parents' Exhibit D4, emphasis added).

<strong><span style="text-decoration:underline">ii.    The CSE Failed to Rely On Evaluative Data and Testimony that Properly Described Zachary's Present Levels of Functioning</span></strong>

95. The CSE chose to reduce Zachary's mandate for speech and language therapy over objections from his parents and service providers, despite having no documentation to support such a reduction.  (Tr. at 228 – 229).

96. Christine Goodman chaired the May 24, 2006, CSE review. (Tr. at 12.)

97. Dr. Goodman chose not to include the findings of Dr. David Salsberg's psycho-educational evaluation on the IEP developed for Zachary.  (Tr. at 52 – 57).

98. At the May 24, 2006 CSE review, the providers from the CPSE program expressed their concerns with the CSE's recommendation of a 6:1:1 placement with autistic children for Zachary because his behaviors did not fit with what they viewed as a "typical" autistic student.  (See Tr. at 57 – 59).

99. These participants were the only people who had ever met Zachary.  (Tr. at 59).

100. Despite possessing updated progress reports from February 2006,detailing a recent period of significant progress, the CSE chose to rely upon progress reports from December 2005 in developing the IEP for Zachary Jonas.  (See Tr. at 100).

101.This determination by the CSE resulted in the development of an IEP that significantly lowers expectation levels and results in a significant loss of educational opportunity for the student.


### iii. The CSE Failed to Meet All of Zachary's Behavioral Needs by Failing to Indicate The Child's Present Social and Emotional Needs.

102. Zachary's behaviors substantially interfered with the educational process and included such dangerous behaviors that his current preschool placement had recently requested that a one to one management paraprofessional be assigned to him.[11] (Tr. at 69; See: Hearing Examiner's Exhibit 1).

103.The CSE failed to indicate whether Zachary's behavior seriously interfered with instruction and whether such behaviors required additional adult supervision. (See Parents' Exhibit B, pg. 6; Tr. at 82).

---

11 At this time it was learned that the witness, Christine Goodman, was relying on documentation that was neither disclosed to Petitioners nor reported to be in her possession when she was initially voire dired before her testimony via telephone was permitted. (Tr. at 69-70).

104. The State Review Officer's holding that the failure to indicate the child's behavior level on the IEP was an 'oversight' is arbitrary, and not supported by evidence. (SRO Decision at 13).

105. As the Impartial Hearing Officer stated: "She's (Dr. Goodman) trying to allege that it was an oversight and I'm saying her explanation as to whether it was an oversight does not hold water because if it were an oversight she should be able to say oh, yes, we meant to check box number two and just administratively and flipping through the pages we missed a check mark." (Tr. at 87)

106. In fact, the Hearing Officer questioned the accuracy of the services to be provided absent any indication regarding the child's present social and emotional performance. (Tr. at 85).

107. The Hearing Officer went on to state, "It's clear from page six [of the IEP] that this child's social/emotional performance analysis and needs were not appropriately addressed at the CSE meeting."  (Tr. at 89 – 90).

108. When asked whether she felt that the behavior and instructional process boxes should have been checked to inform placement officers about the child's behavior management needs, Dr. Goodman answered in the affirmative. (Tr. at 84).

109. Dr. Goodman further testified regarding her opinion that it would have been helpful to the staff members at the recommended placement [to fully understand the child] had the boxes indicating the child's present levels of support been checked off. (Id.).

### C.  The Committee on Special Education Failed to Develop Appropriate Annual Goals and Short Term Objectives for Zachary Jonas

110. An IEP must include annual goals and benchmarks that are related to meeting the student's needs arising from his or her disability (34 CFR 300.347[2]).

111. The IEP developed for Zachary fails to provide appropriate classroom goals and objectives; appropriate related service goals and objectives; and appropriate special education objectives.  (*See* Parents' Exhibit B).

112. The Annual Goals developed for Zachary Jonas are insufficient to allow his teachers and service providers to gain an understanding of his current levels of performance without performing their own extensive evaluations.  (*See* Id.).

113. The annual goals and short term objectives fail to include any benchmark levels of performance.[12] (*See* Id).

114. Meaningful, measurable objectives offer a target to work towards and a way to evaluate progress. The ambiguous, unquantifiable goals listed in Zachary's IEP are at odds with IDEA objectives to have tangible, measurable goals with a delineated baseline from which to work. "Vague and unmeasurable objectives are the handmaiden of stagnation, as a program cannot possibly confer an educational benefit to a child if his/her teachers and parents do not know where the child is, where they should go and when they has arrived." (Escambia v. Benton 406 F.Supp.2d 1248 (2005)).

115. The annual goals and short term objectives fail to include any schedule for determining Zachary's progress towards meeting either.[13] (See Parents Exhibit B; see also *Application of a Child with a Disability*, Appeal No. 00-021).

---

12 Dr. Goodman was unable to explain where Zachary's baseline of performance was for any annual goal that she chose to include in the IEP.  (See Tr. at 102).

116. An IEP must identify how progress toward its goals will be measured including the "evaluative criteria, evaluation procedures, and schedules to be used to measure progress towards the annual goals" (34 CFR 300.347[a][7][i]).

117. As the Hearing officer properly stated, "Annual accomplishment goals as well as short term objectives should properly have a starting point… his annual goal from where he started from, to where he should be a year from now should be performance of A, B, and C… or at least an annual discernable goal of what it – what the increase [of] his play skills mean[s].  It [the annual goal as drafted] don't mean nothing."(Tr. at 104 – 105).

118. In fact, Dr. Goodman testified that it was her expectation that Zachary's teachers would have to assess him at the beginning of the year in order to determine what his present levels of performance were, as well as to determine what areas of deficit should be worked on.  (See Tr. at 109).

119. The New York City Department of Education relies upon a coding system to inform teachers and parents as to how progress towards meeting the annual goals and short term objectives will be reported.  (See Parents' Exhibit B, pgs. 8 – 15).

120. Despite this, the CSE failed to include any indication as to the methods of measurement or rate of progress expected from Zachary on the IEP.  (Id.).

121. The Parent testified that when reading the IEP she is unable to fully understand the goals or independently measure any progress towards meeting the annual goal.  (Tr. at 175).

**D.  The New York City Department of Education Failed to Offer Zachary A Specific Placement**

---

13 This error is compounded by the fact that Zachary is mandated to participate in alternate assessments

122. In New York City, the placement process is bifurcated from the IEP development; neither the parent or anyone from the team that developed the plan has input into the specific site that is recommended for the student. This makes a detailed IEP with current levels of functioning all the more important for proper placement to occur.

123. The placement process "is not really finalized until the placement office sends a notice to the parent offering them a *specific class*." (Tr. at 118).

124. The Parents were notified that they would be receiving a Final Notice of Recommendation ("FNR") which would direct them to a specific site where Zachary would attend school during the 2006 – 2007 academic year. (Tr. at 182).

125. On June 20, 2006, the parents received a telephone call from the CSE's placement office notifying them that they should have received a placement letter, however, the placement recommended on that notice was incorrect, and directing them to follow up with a different school. (Tr. at 183).

126. The Parents did not receive this notice until the July 4th weekend. (Tr. at 184).

127. The Parents made several attempts to contact the school recommended for Zachary, and were finally notified that the site had closed and was being moved to a new location for the 2006 – 2007 academic year. (Tr. at 186 – 187).

128. No one was able to inform the Parents where the new site would be located. (Tr. at 187).

129. In August 2006, the Parents were notified that the site recommended for Zachary was holding a one day orientation for new students on August 11, 2006, the last day of school during summer 2006.  (Tr. at 187).

E.  **The Specific Class Defended at the Impartial Hearing Failed to Suitably and Functionally Group Zachary With Children With Similar Needs and Abilities**

130. The parents of approximately eight other students were present at the recommended program on this day and a speech therapist spoke with the assembled group.  (Tr. at 188).

131. The assembled parents were told that the children in the program were largely non-verbal and the ultimate goal was to move these children to an augmentative communication device.  (Tr. at 190).

132. In fact, the speech therapist presenting the program to the parents informed them that the program typically did not have any verbal children.  (Tr. at 190).

133. The parents were further informed that all but two of the children in the program were currently mentally retarded.  (Tr. at 190).

134. The parents were informed that the children in the program typically engaged in self stimulatory behaviors and, for the most part, were not toilet trained.  (Tr. at 191).

135. The program's speech therapist was not familiar with Apraxia, which Zachary is diagnosed with.  (Tr. at 190 – 191).

136. The parents were informed that, despite what the CSE had informed them about the mainstream opportunities that would be made available to Zachary, there

were no mainstreaming opportunities available for children within this program. (Tr. at 224 – 225).

137. Dr. Salsberg testified that it was extremely important that Zachary not be exposed to children with behavioral problems, and indicated that it was extremely important for Zachary to have peers who are both verbal and of average cognitive ability, unlike the 6:1:1 classes offered by the New York City Department of Education. (See Tr. at 365 – 368).

138. The program recommended by the Department of Education was not in operation until September 2006. (Tr. at 515).

139. The size and composition of a special class must be based on the similarity of the individual needs of the students and be composed of students with disabilities with similar individual needs. (8 NYCRR §§200.6(g)(2) – (8); 200.1(i), (uu) and (ww)(3)(ii)).

140. There are four mixed age 6:1:1 classes serving children with autism in grades K – 2 at P. 811M at P. 149. (Tr. at 516).

141. All of these classes are full.14 (Tr. at 517).

142. There are additional classes for students with emotional disturbances and mental retardation and the site operates a day treatment program for students with severe emotional disturbances. (See Tr. at 518 – 520).

143. The students of all of these programs travel to and from school together and attend assemblies and lunch together. These, and not typically developing

---

14 The class profile provided by the Department of Education in response to a subpoena *duces tecum* indicates that there are only five children in this class.

students in the general education population, would be the only students that Zachary would be exposed to. (See Tr. at 520).

144. All of the students were grouped by the school's administration and staff upon arrival at P. 811M.  (Tr. at 524).

145. Some students were inappropriately placed by the administration and required shuffling to another class.  (See Tr. at 524 – 525).

146. When a student is recommended for P. 811M, they are recommended only to the site and not to a specific class.  (Tr. at 527).

147. The CSE does not place students within specific classes at P. 811M.  (Tr. at 528).

148. The four classes operating at P. 811M are labeled Y31, Y32, Y33, and Y34.  (Tr. at 536 – 537).

149. Class Y31 reportedly consists of verbal students with cognitive abilities.

150. Class Y32 reportedly consists mostly of non-verbal students but has some students who are verbal.  (Tr. at 538).

151. Class Y34 reportedly consists of non-verbal students.  (Tr. at 539).

152. The principal of the program, Mr. Barry Daub, reviewed Zachary's evaluative material in contemplation of the Impartial Hearing upon receiving a subpoena *duces* tecum for a classroom profile and determined that Zachary would have been appropriately placed in class Y33.  (Tr. at 539 – 540).

153. As of September 2006, all of the children in class Y33 were non-verbal and used the PECS system to communicate.  (Tr. at 540).

154. Ms. Nieves, the Assistant Principal in charge of the site, testified that class Y33 would not be an appropriate placement for Zachary.  (Tr. at 542).

155. Ms. Nieves testified that students diagnosed with a pervasive developmental disorder (PDD), one of Zachary's diagnoses, are placed in class Y34, a non-verbal class.  (Tr. at 544).

156. Ms. Nieves testified that in order to place students in one of their classes, the school needed to conduct its own evaluations, thus removing the CSE from its mandated duty of recommending specific classes for students with disabilities. (Tr. at 546 – 547).

157. Ms. Nieves, the Assistant Principal of the recommended program testified that most of the children in her program are non-verbal and use a PECS system as an augmentative communication method.  (See Tr. at 491 – 492).

158. Dr. Salsberg testified that placing Zachary in a classroom with children with behavioral difficulties, given his significant language difficulties, is likely to result in his mimicking and engaging in more significant inappropriate behaviors.  (See Tr. at 418 – 419).

159. The placement recommended by the CSE fails to group Zachary with students of similar needs and abilities, as testified to by the DOE witness from the program.

### AS AND FOR A SECOND CLAIM
### THE PARENTS RESPECTFULLY ALLEGE:

### THE PARENTS' UNILATERAL PLACEMENT AT THE FORUM SCHOOL WAS APPROPRIATE TO MEET ZACHARY'S INDIVIDUALIZED SPECIAL EDUCATION NEEDS AND HAS CONFERRED AN EDUCATIONAL BENEFIT UPON HIM

160. Zachary is attending the Forum School for the 2006 – 2007 academic year.  (Tr. at 193).

161. The school, which is approved by the State of New Jersey and with which School Districts in New York State regularly contract with, is made up of approximately 160 students who present with neurologically based disorders, including significant speech and language disorders and autistic spectrum disorders. (Tr. at 193 – 194; 250 – 251).

162. Classes are made up of nine or ten students and are grouped by age and level of functioning. (Tr. at 251).

163. Children are grouped within the classes by the Director, Assistant Director, teachers, and speech and language therapists after a review of documentation and observing the child's performance in the classroom setting. (See Tr. at 261 – 262).

164. Speech and Language therapy is provided by the school and occupational and physical therapy is available on site and is provided by outside therapists. (Tr. at 263 – 264).

165. The Forum School utilizes and implements various speech and language techniques to facilitate language in Apraxic children. (Tr. at 192).

166. Zachary is placed within a classroom of ten children with average to above average cognitive ability, one head teacher and five assistant teachers. (Tr. at 194).

167. As Zachary does not present with the social deficits of a typically autistic child, he requires a high amount of peer interaction and adult attention in order to keep from regressing. (Tr. at 199 – 200).

168. Dr. Salsberg has continued to follow Zachary during his attendance at the Forum School, has spoken with his parents and the school about the progress that Zachary has made. (See Tr. at 365 – 366).

169. Zachary has adapted well to the routine at the Forum School, and is currently thriving. (Tr. at 196).

170. The school has developed an individual behavioral plan for Zachary and uses a communication book to notify his parents about what is happening in school each day and how Zachary is doing. (Tr. at 196 – 197).

171. Zachary was placed in a class with appropriate models of language and academic skills. (Tr. at 366).

172. Such models are important for Zachary because he needs to be consistently engaged by his peers due to the fact that his verbal abilities otherwise mask his potential. (See Tr. at 366).

173. Tuition at the Forum School is $37,319, and is paid by the Parents in ten installments. (Tr. at 253; 187).

174. In order to pursue admission, a full review of clinical documentation and an interview are required. (See Tr. at 255 – 256).

175. Zachary's parents applied to the school in the Spring of 2006 and Zachary was accepted to the school on June 13, 2006. (See Tr. at 257; see also Parents' Exhibit L).

176. When a student arrived at the Forum School from New York, the teachers and therapists review the student's IEP and conduct a series of evaluations and then

draft a more detailed set of goals and objectives to work on for the academic year. (Tr. at 266 – 267).

177. These goals and objectives are reviewed three times per year, progress reports are provided and the goals and objectives are updated, if necessary. (Tr. at 267).

178. The Forum School developed a set of goals and objectives for Zachary Jonas for the 2006 – 2007 academic year. (Tr. at 271; See Parents' Exhibit K).

179. Speech and Language Therapy is provided to Zachary three times per week on an individual basis and focuses on articulation and appropriate social responses. (Tr. at 275 – 276; 277).

180. During the Summer of 2006, Melissa Honig, Zachary's classroom teacher, reviewed the evaluative material in Zachary's file. (Tr. at 434).

181. Zachary initially presented with issues in the area of behavior, including compliance, listening to directions, and the need for a high amount of individualized attention to follow through and comply with directions given to him throughout the day. (Tr. at 434).

182. The school developed an individualized program geared towards Zachary's needs, including a behavioral component and academic goals and objectives. (See Tr. At 434 – 435).

183. Zachary transitions between activities without any problems and enjoys engaging in group activities. (See Tr. at 436).

184. Zachary arrives in the classroom, engages in work on his behavioral program, and then joins his class in academic activities, group activities, lunch, quiet time, play time, related services, and free time. (See Tr. at 436 – 437).

185. There are nine students, six assistants and one teacher in the classroom.  (Tr. at 438).

186. The other students in the classroom present with similar needs and functional levels and similar learning characteristics.  (Tr. at 439 – 440).

187. Zachary has shown improvement in many areas since September 2006.  (See Tr. 440 - 448).

188. Overall, Zachary participates in individual academic work, as well as in group activities on a more consistent basis than he did in September 2006.  (Tr. at 440 – 441).

189. Zachary continues to require very specific, individualized attention from teachers and assistants in order for him to follow through on multi-step directions.  (Tr. at 442).

190. The teaching assistants rotate on a weekly basis to ensure generalization of skills learned.  (Tr. at 451).


## AS AND FOR A THIRD CLAIM
## THE PARENTS RESPECTFULLY ALLEGE:


## EQUITABLE CONSIDERATIONS SUPPORT A CLAIM FOR
## REIMBURSEMENT


191. The New York City Department of Education's Committee on Special Education failed to comply with a properly executed subpoena *duces tecum* presented to it on or about October 6, 2006.  (See Tr. at 23 – 26).

192. The Impartial Hearing Officer improperly mischaracterized the testimony of

witnesses.  (See e.g., Tr. at 326 – 327):

Q: "*With regard to students who are placed at Forum by their parents and whom

the Board of Education does not recommend on an IEP that the student attend the Forum

School, is Forum responsible or required to comply with that child's IEP?*"

A: "*Generally, if the parent places the child here and they are funding the

placement, we would provide a program that the parents are, you know, in agreement

with*."

IHO: "*I'm going to strike the question and I'm going to strike the answer, even

though the witness was very truthful in her answer that she didn't know the answer to it,

because that was not an appropriate question to ask this witness*."

## A.  <u>The New York City Department of Education Delayed Recommending a Placement for Zachary, Through Bureaucratic Inefficiencies, Until July 2006</u>

193. New York law provides a presumption of mailing and receipt by the addressee

where there is proof of a standard office practice or procedure designed to ensure

that items are properly addressed and mailed (<u>Nassau Ins. Co. v. Murray</u>, 46

N.Y.2d 828, 829 [1978]).  "As long as there is adequate testimony by one with

personal knowledge of the regular course of business, it is not necessary to solicit

testimony from the actual employee in charge of the mailing" (<u>In re Lumbermens</u>

<u>Mutual Casualty Co. v. Collins</u>, 135 A.D.2d 373, 374 [1st Dep't 1987]; <u>but see</u>

<u>Rhulen Agency, Inc. v. Gramercy Brokerage, Inc.</u>, 106 A.D.2d 725, 726 [3d

Dep't *1984] ["It is necessary to prove by testimony of the person who mails them

that letters are customarily placed in a certain receptacle and are invariably*

*collected and placed in a mailbox."]).*  (Quoting <u>Application of a Child with a Disability</u>, Appeal No. 06-035).

194. In order to rebut the presumption of mailing and receipt, the addressee must show more than the mere denial of receipt and must demonstrate that the sender's "routine office practice was not followed or was so careless that it would be unreasonable to assume that the notice was mailed" (<u>Nassau Ins. Co.</u>, 46 N.Y.2d at 829-30).

195. The CSE failed to address the Final Notice of Recommendation to the proper address.  (See Tr. at 183 – 186; see also: Parents' Exhibits B and C).

196. This error was egregious in this matter because while the mail was addressed to a residence within the same building, it was forwarded by the US Postal Service due to the recent move of the actual resident of the apartment resulting in the delay of its receipt by almost a month.  (Tr. at 186).

**B. <u>Respondent Failed to Offer a Specific Class, and Engages In Such Behavior As a Matter of Practice</u>**

197. The program recommended by the Department of Education was not in operation until September 2006.  (Tr. at 515).

198. There are four mixed age 6:1:1 classes serving children with autism in grades K – 2 at P. 811M at P. 149.  (Tr. at 516).

199. When a student is recommended for P. 811M, they are recommended only to the site and not to a specific class.  (Tr. at 527).

200. The CSE does not place students within specific classes at P. 811M.  (Tr. at 528).

C.  **The Parents Cooperated With the Committee on Special Education, Visited the Proposed School, and Determined that Placement There Would Not Meet Zachary's Needs and Abilities**

201. Zachary's parents were finally afforded the opportunity to visit the proposed placement at a parent orientation on August 11, 2006, the last day of school. (Tr. at 187)

202. The parents observed the program and found it to be inappropriate to confer and educational benefit to Zachary. (Tr. at 192)

D.  **A Parental Preference For a Private School is Not Dispositive of a Claim for Tuition Reimbursement**

203. A parent's preference for a private school placement is not dispositive of a claim for tuition reimbursement (Application of a Child with a Disability, Appeal No. 05-087; Application of a Child with a Disability, Appeal No. 05-070; Application of a Child with a Disability, Appeal No. 03-003; Application of a Child with a Disability, Appeal No. 02-059; Application of the Bd. of Educ., Appeal No. 01-068).

204. The equities do not prohibit a parent from entering into a contract with a preferred private school prior to the date of the relevant CSE meeting (Application of a Child with a Disability, Appeal No. 03-091; Application of a Child with a Disability, Appeal No. 02-059; Application of a Child with a Disability, Appeal No. 99-015; Application of a Child with a Disability, Appeal No. 97-44).

205. In the instant matter, the Parents waited until after the CSE had convened and recommended a placement that they disagreed with, particularly since the CSE relied upon outdated evaluative materials in determining the placement recommendation.

206. The IDEA provides that reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (Application of the New York City Department of Education, Appeal No. 06-076; 20 U.S.C. § 1412[a][10][C][iii]; see Frank G., 459 F.3d at 363-64; Mrs. C. v. Voluntown, 226 F.3d 60, 66 n.9 [2d Cir. 2000]).

207. In the instant matter, the Parent cooperated with the Department of Education throughout, providing private evaluations, making Zachary available for observation and testing, making efforts to learn more about the program recommended for their child, and visiting the recommended placement.


**Wherefore**, it is respectfully requested that the New York City Department of Education be ordered to reimburse the parents for tuition paid to the Forum School for Zachary's placement there during the 2006 – 2007 academic year.


New York, NY
September 10, 1007

_____/s_____
JESSE COLE FOLEY