

# The University of the State of New York
## The State Education Department
### State Review Officer

No. 07-022

Application of a CHILD WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education

**Appearances:**
Skyer, Castro, Foley & Gersten, attorney for petitioners, Jesse C. Foley, Esq., of counsel

Hon. Michael A. Cardozo, Corporation Counsel, attorney for respondent, Andrew J. Rauchberg, Esq., of counsel

## DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their son's tuition costs at the Forum School (Forum) for the 2006-07 school year. The appeal must be dismissed.

At the time the impartial hearing commenced in October 2006, the child was five years old and attending school at Forum (Tr. pp. 157, 193). Forum is located and licensed in New Jersey, and provides special education services to approximately 160 students between the ages of 3 and 16 who have neurologically based disorders, including significant speech and language disorders and autism spectrum disorders (Tr. pp. 250-51). Respondent has reportedly placed students at Forum as an approved emergency interim placement (Tr. pp. 251-53). For the 2006-07 school year, the child has been enrolled in a classroom of nine children with one teacher and six assistant teachers (Tr. p. 438). The children in the child's class are described as having average to above average cognitive abilities (id.). The child receives speech and language therapy three times a week in 20 minute sessions as part of his program at Forum and also receives occupational therapy twice a week for 30 minutes through a privately contracted provider (Tr. pp. 264, 443, 445, 455). The child's eligibility for special education and related

services as a child with autism is not in dispute in this appeal (Parent Ex. A; see 8 NYCRR 200.1[zz][1]).[1]

The record is sparse regarding the child's early educational history. The child was evaluated and began to receive early intervention services at one year, nine months (Tr. pp. 142-43). When the child was approximately two and one half years old, a pediatric neurologist from Mt. Sinai Hospital reportedly determined the child met the criteria for a diagnosis of a pervasive developmental disability, not otherwise specified (PDD-NOS), and the child's services were intensified (id.). When the child was 3 1/2 years old, a developmental pediatrician reportedly determined that the child met the criteria for a diagnosis of developmental dyspraxia (Tr. p. 145). Services continued when the child transitioned from early intervention services to respondent's Committee on Preschool Special Education (CPSE) (Tr. p. 144). Initially, the child was reportedly placed by respondent's CPSE in a mainstream preschool program with a 1:1 special education itinerant teacher, speech and language therapy, and occupational therapy (Tr. pp. 145-46). The CPSE changed the child's placement for the 2005-06 school year to a preschool program at the Child Development Center (CDC) in an 8:1+2 class, and the child received speech and language therapy, occupational therapy, play therapy and music therapy (Tr. pp. 148-49; Parent Ex. F at p. 1).

In a CDC counseling update dated December 9, 2005, the counselor described the child as easily distracted and inconsistent with eye contact, but noted that he sought physical closeness and made initial attempts to engage people (Parent Ex. J at p. 1). Since beginning counseling, she reported that the child increased his attention to play activities, increased his representational play skills, and used one-word labels to indicate a desired activity (id.). The counselor reported that counseling sessions addressed the child's need to increase his frustration tolerance and to identify and express emotions (id. at p. 2).

In a speech and language progress report dated December 15, 2005, the child's speech therapist reported that the child presented with severe oral apraxia, which made it difficult for him to control the oral motor movements necessary for speech production (Parent Ex. I at p. 2). She noted that the child had difficulty relating his thoughts verbally, which often resulted in frustration (id.). The speech therapist reported that the child was now able to imitate opening and closing his jaw, puckering, rounding and retracting his lips, and was beginning to imitate isolated lingual movements (id.). The child could produce a number of consonant sounds and was able to imitate certain sounds during familiar, repetitive drills but was not doing so consistently in spontaneous speech (id.). He was able to produce familiar phrases intelligibly, and could label, repeat and comment, but his spontaneous speech was characterized by misarticulations (id.).

---

[1] Although the child's classification as a child with autism is not in dispute in this appeal, petitioners asserted at the impartial hearing that a diagnosis of severe verbal developmental dyspraxia is a more accurate description of the child's disability, as he did not have the "social deficits of an autistic child" (Tr. pp. 143-45, 199, 238-39). At the impartial hearing, the child's mother testified that she did not agree with the autism classification and opined that the child should be classified as having a speech and language impairment (Tr. pp. 220-21; see 8 NYCRR 200.1[zz][11]). I note that the child's mother testified at the impartial hearing that she had not requested respondent's Committee on Special Education (CSE) to reconsider the child's classification (Tr. p. 239).

In a progress report dated December 16, 2005, the child's occupational therapist reported "some improvement" in the child's performance; however, the evaluator indicated that the child continued to have sensory processing weaknesses in multiple sensory systems as well as inconsistency with self-regulation, which made it difficult for him to focus attention and also affected his social relationships with peers (Parent Ex. G at p. 2). She noted that the child could easily become overwhelmed with varied, competing stimulation and had difficulty following a simple two- to three-step obstacle course (id.). Scatter skills were noted in fine motor development (id.). The child was able to don and remove shoes and socks, thread lace through small openings and use scissors to snip paper (id.). The occupational therapist recommended that the child continue to receive occupational therapy services "at the current mandate" (id. at p. 3), and she noted that he received additional occupational therapy "outside of CDC" (id. at p. 1).

In an educational progress report dated December 19, 2005, the child's teacher described the child as "warm, friendly and highly related" with adults and "clearly interested in his peers," noting that he could identify his classmates by name (Parent Ex. F at p. 1). He could engage in parallel play, was beginning to initiate brief interactions, and would participate in songs and imitate body movements accompanying the songs, although the teacher noted that he would frequently continue to sing the songs after an activity had ended (id. at pp. 2-3). The teacher reported that the child could use single words to make requests and was demonstrating the emerging skills of greeting, protesting and name recognition (id.). According to the progress report, the child could follow simple one-step directions inconsistently when he was within a familiar context and had the aid of visual cues (id. at pp. 3-4).

The teacher explained that the child communicated primarily through nonverbal means (Parent Ex. F at p. 2) and that the majority of his spoken language consisted of single words and some two-word phrases (id. at pp. 2-3). Comparing the child's limited use of single words to request desired items when school began, the teacher observed progress in the frequency and variety of his purposeful verbalizations, both for requests and to comment on his environment (id. at p. 3). The child's verbalizations occurred most frequently during his routine activities (id.).

The progress report also shows that, academically, the child demonstrated an increase in ability to remain on task from "a few seconds at a time" to "up to ten minutes on some tasks," although he was frequently distracted by actions of others in the room and found it difficult to regain focus until the distraction had ended (Parent Ex. F at p. 4). According to the teacher, the child responded to routines and became disorganized and more easily distracted in novel or less structured settings (id.). In a one-to-one setting, the child was able to match pictures, count by rote, match pictures, sort objects and complete inset puzzles (Parent Ex. F at p. 5). The teacher indicated that the child had begun to demonstrate an understanding of pictorial symbols and would point to pictures to indicate his desires (id.). The child had been observed spontaneously labeling most letters and pointing to the names of classmates, but he would not do so when prompted (id.). The teacher suggested that these skills were related to Applied Behavior Analysis (ABA) therapy that the child was receiving at home (id.). The teacher also reported that the child had begun to engage in representational play by demonstrating feeding a doll or a teacher (id.).

According to the progress report, the child was described as able to complete a number of self-help tasks, including pulling up his pants independently and zipping a front zipper that had

3

been started (Parent Ex. F at p. 7). He could wash his hands independently with prompts, but he was "not yet" able to use the toilet independently (id.). The child was able to clean up materials after an activity without prompting (id.).

The teacher recommended that the child be placed in a structured classroom in a 12-month program with a high teacher/student ratio and a calm environment with non-aggressive peers (Parent Ex. F at p. 7). She recommended that he continue receiving speech-language therapy, occupational therapy and counseling (id.).

In December 2005, the child was evaluated at the McCarton Center (Parent Ex. E). A neuropsychological evaluation report (McCarton evaluation report) described the child as "very easily distracted and frustrated" during the evaluation, requiring the assistance of his special education teacher to focus on selected tasks, and the child was noncompliant when frustrated or bored (id. at p. 2). He showed minimal interest in interacting with the evaluator but enjoyed social praise (id.). The evaluator described his attention as variable, he responded to structure and clear limits, but he remained "fidgety and impulsive" and distracted throughout the assessment (id.).

The evaluator observed the child playing with toys, and the child particularly enjoyed cause and effect toys. No symbolic play was observed, but his parents reported that this skill was emerging at home (Parent Ex. E at p. 2). He used word approximations to communicate his needs, named some objects and actions when prompted and used one two-word expression during testing (id. at p. 3). The child responded to simple instructions, but when involved in an activity, he required several attempts before responding to his name (id.).

Administration of the Stanford-Binet Intelligence Scale – 5th Edition (SB5) resulted in a nonverbal IQ score of 61 (very low range), a verbal IQ score of 59 (very low range) and a full scale IQ score of 58 (very low range) (Parent Ex. E at p. 3). According to the evaluator, the child was able to match a few simple objects with some difficulty (id.). The child also had difficulty describing the content of a picture (id.). He labeled a few simple objects and actions and demonstrated an understanding of simple actions (id.). While the child was able to count, he did not demonstrate understanding of one-to-one correspondence (id. at p. 4). The child's performance on the non-verbal, visual-spatial processing subtest of the SB5 indicated functioning in the average range (id. at p. 5). The evaluator indicated that the child's performance on the receptive One-Word Picture Vocabulary Test resulted in a score at the one year, seven month age range (id. at p. 4).

Based on parent input, most of the child's scores on the Vineland Adaptive Behavior Scales were in the low range for all domains; however, the child's performance in written communication, domestic daily living and social coping yielded scores in the adequate range (Parent Ex. E at p. 10). The child reportedly had over 100 words and approximations that he would put together in two to three-word phrases and could "spontaneously relate his experiences in simple terms" but was not able to deliver a simple message (id. at p. 5). The McCarton evaluation report shows that the child recognized major body parts, could recite all letters and recognize names of classmates (id.). Socially, the child was described as participating in activities with peers, observing others and imitating simple actions, and able to follow rules and routines at school (id.). The evaluator reported that the child had not yet formed friendships and did not show preference for some peers over others (id.).

4

According to the evaluator, results of the Childhood Autism Rating Scale (CARS) were based on observations and parent report and resulted in an overall score of 31, which placed the child above the minimum score of 30 required for categorization as having an autism spectrum disorder (Parent Ex. E at p. 7). The evaluator noted that many of the child's behaviors were "associated with the diagnosis of a pervasive developmental disorder" and that he continued to present with verbal apraxia and auditory processing deficits (id.). The evaluator indicated that standardized test results should be regarded "cautiously" due to the child's language deficits and behavior and noted that the child's parents and his teacher opined that he was "capable of more than he was able/willing to display" during the evaluation session (id. at pp. 2, 7).

A psychological evaluation report from Pediatric Assessment Learning and Support (PALS) was prepared by a psychologist after a two-day evaluation of the child in April and May 2006 (Parent Ex. D). The evaluator reported that the child separated easily from his parents and appeared interested in interaction (Parent Ex. D at p. 2). He exhibited variable attention and was able to work on nonverbal tasks for brief periods and on verbal tasks for less time (id.). Repetition and rephrasing were required for all tasks. The evaluator reported that the child's eye contact was limited, and he demonstrated some labeling abilities, spontaneously made simple requests and was able to work well within a structured setting (id.).

Noting that assessment of the child's cognitive functioning was limited by language deficits and distractibility, the evaluator conducted selected subtests of the SB5 and the Wechsler Preschool and Primary Scale of Intelligence (WPPSI-III) (Parent Ex. D at p. 2). Administration of the verbal knowledge and nonverbal fluid reasoning subtests of the SB5 yielded scaled (and percentile) scores of 5 (5) and 11 (63) respectively, for which the evaluator reported an abbreviated IQ score of 88 (21) (id. at pp. 2, 6). The evaluator reported that the child's verbal knowledge factor score represented "an IQ equivalent of 75" and his nonverbal fluid reasoning index score was equivalent to an IQ score of 105 (Tr. pp 369-70; Parent Ex. D at p. 3). The child's performance on the information subtest of the WPPSI-III yielded a scaled (and percentile) score of 4 (2) (Parent Ex. D at p. 6). On two performance subtests of the WPPSI-III, the child's performance yielded a scaled (and percentile) score of 4 (2) in block design and 8 (25) in matrix reasoning (id.). The child's performance on the receptive vocabulary and picture naming subtests yielded scaled (and percentile) scores of 6 (9) and 8 (25) respectively (id.). The evaluator noted that the child had difficulty answering general information questions on the WPPSI-III, but he was able to respond when given visual cues (id. at p. 3). While the child was able to match blocks to model designs when designs were modeled for him, measurement of his perceptual reasoning abilities was limited by his ability to understand task instructions (id.).

The evaluator concluded that the child's test scores did not adequately reflect his "abilities and potential" and that he demonstrated "better abilities and potential than is evident due to his significant language difficulties" (Parent Ex. D at pp. 2-3). The evaluator also indicated that the child's weaknesses in receptive and expressive language affected assessment of his cognitive and academic skills (id.). The evaluator described pre-academic skills as "emerging," but noted that they could not be assessed due to language difficulties (id. at p. 3). The evaluator recommended continued placement in a small, highly structured, language-based special education class in a 12-month center-based program where the child could continue to receive speech-language and occupational therapies (id. at p. 4). He also recommended various learning strategies that

include reducing distractions with preferential seating, breaking instructions into small segments, varying instructional strategies, monitoring for comprehension and using visual aids (id.).

Respondent's Committee on Special Education (CSE) convened on May 24, 2006 and developed an individualized education program (IEP) for the child's kindergarten (2006-07) school year (Parent Ex. B). The child's academic performance and learning characteristics indicated that, based on education reports and teacher input, the child's reading, writing and mathematics skills were at a pre-K.2 level (id. at p. 3). The CSE determined that the child presented with severely delayed receptive-expressive language, pragmatics and symbolic play, and he used articulatory approximations to speak words and phrases (id. at p. 4). The child was reported to have made progress in all areas and demonstrated an understanding of several concepts from preschool; however, his speech and language skills continued to be delayed, which impeded his ability to fully participate in classroom activities and interact with his peers (id. at p. 5). The IEP indicates that the child could label letters, numbers and colors, and recognize the names of his classmates (id. at p. 5). The IEP described the child as sweet and friendly and as having developed more relatedness (id. at p. 6). The CSE recommended a 12-month school year program consisting of a 6:1+1 special class in a specialized school and related services of speech-language therapy, occupational therapy, and counseling (id. at pp. 1-2, 16, 18). The IEP reflected that the CSE rejected a less restrictive program because the child would benefit from a small structured special class that addressed his academic needs (Tr. p. 199; Parent Ex. B at p. 33). The proposed IEP contained goals and corresponding objectives to address the child's needs in cognitive, physical, social and emotional, speech and language, activities of daily living, and social skills (Parent Ex. B at pp. 8-15). The location for the child's proposed placement was not identified.

In its Final Notice of Recommendation dated June 9, 2006, the CSE recommended placement in respondent's P811, also known as the Mickey Mantle School (Tr. p. 187; Parent Ex. C). However, the child's mother testified that she did not receive this letter until approximately July 4, 2006 because it had been addressed to a neighbor's apartment in her building (Tr. pp. 183-84). The child's mother stated that she attempted to contact the school several times, but was unsuccessful (Tr. pp. 186-87). Respondent contacted petitioners in August 2006 to invite them to a parent orientation to observe a class that was similar to the recommended placement (Tr. pp. 187, 189). Petitioners attended the orientation session on August 11, 2006, but did not consider it to be an appropriate placement for the child (Tr. pp. 187, 191).

Petitioners requested an impartial hearing by due process complaint notice dated August 15, 2006, which alleged that respondent failed to offer the child a free appropriate public education (FAPE) on procedural and substantive grounds (Parent Ex. A at p. 1).[2] Petitioners also

---

[2] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]).

informed respondent that they were unilaterally placing the child at Forum and that they would be seeking direct funding or reimbursement for the costs of such placement (id.).

The impartial hearing commenced on October 10, 2006 and concluded on December 12, 2006 after three days of testimony. By decision dated January 9, 2006, the impartial hearing officer found that any procedural irregularities during the CSE meeting or afterwards did not support a finding that respondent failed to offer the child a FAPE (IHO Decision at pp. 5-6). The impartial hearing officer also found that the program offered by respondent was appropriate and would have offered educational benefit to the child (id. at p. 9). The impartial hearing officer denied petitioners' request for tuition reimbursement (id.).

Petitioners appeal and assert that the impartial hearing officer erred by finding that respondent had offered the child a FAPE because: 1) the CSE was improperly constituted; 2) the CSE failed to consider recent psychological testing and evaluation; 3) the IEP failed to identify the child's present levels of functioning; 4) the CSE failed to develop appropriate annual goals and short term objectives; 5) respondent failed to offer the child a specific class placement; and 6) the child would not have been appropriately grouped at the CSE's recommended placement. Petitioners further contend that the child's unilateral placement at Forum was appropriate to meet his special education needs and that equitable considerations favor their claim for tuition reimbursement.

Respondent asserts in its answer that petitioners have not demonstrated that the services offered by respondent were inadequate or inappropriate or that petitioners' unilateral placement was appropriate. Respondent further alleges that the equities do not favor an award of tuition reimbursement to petitioners.

The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]). A FAPE includes special education and related services designed to meet the child's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17; see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.22).[3]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a child by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by

---

[3] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. In this case, none of the new provisions contained in the amended regulations are applicable because all the relevant events occurred prior to the effective date of the new regulations. However, for convenience, citations herein refer to the regulations as amended because the regulations have been reorganized and renumbered.

school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the child a FAPE (id.; see 20 U.S.C. § 1412[a][10][C][ii]; 34 C.F.R. § 300.148). The first step is to determine whether the district offered to provide a FAPE to the child (see Mrs. C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]). A FAPE is offered to a child when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the child to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra, 427 F.3d at 192). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Pursuant to the IDEA, when procedural violations are alleged, an administrative officer may find that a child did not receive a FAPE only if the procedural inadequacies (a) impeded the child's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; see Matrejek v. Brewster Cent. Sch. Dist., 2007 WL 210093, at *2 [S.D.N.Y. Jan. 9, 2007]). The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 126 S. Ct. at 531, 536-37 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a

Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

Turning to petitioners' assertion that they were denied meaningful participation at the CSE meeting because the CSE was improperly constituted, I find that petitioners did not establish that the CSE failed to include an appropriate special education teacher, a regular education teacher, and the full participation of a parent member. First, I find that the participation of the child's preschool special education teacher at the CSE meeting satisfied the "special education teacher of the child" procedural requirement (34 C.F.R. § 300.321[a][3]; 8 NYCRR 200.3[a][1][iii]). Second, a regular education teacher was not required to attend the CSE meeting because a regular education environment was not sought by petitioners nor would it have been appropriate for the child (Tr. p. 215; see 34 C.F.R. § 300.321[a][2]; 8 NYCRR 200.3[a][1][ii]). Third, although the additional parent member reportedly left the CSE meeting early (Tr. p. 172), I find that her absence for part of the meeting did not rise to the level of a denial of a FAPE (34 C.F.R. § 300.513[a][2]) because the child's mother testified that petitioners felt comfortable speaking for themselves and that they were given the opportunity to speak and clearly put forth their position at the CSE meeting (Tr. pp. 214, 218, 226). Thus, I find that petitioners have not shown that the composition of the CSE resulted in a denial of educational benefit or opportunity for the child or that it significantly impeded parental participation in the formation of the IEP.

Petitioners contend that respondent failed to offer the child a specific class placement. In respondent's Final Notice of Recommendation dated June 9, 2006, the CSE recommended placement in respondent's P811, also known as the Mickey Mantle School (Tr. p. 187; Parent Ex. C). However, the child's mother testified that she did not receive this letter until approximately July 4, 2006 because it had been addressed to a neighbor's apartment in her building (Tr. pp. 183-84). The child's mother stated that she then made several attempts to contact the school, but was unsuccessful (Tr. pp. 186-87). However, respondent contacted petitioners in August 2006 to invite them to a parent orientation to observe a class that was similar to the recommended placement (Tr. pp. 187-89). Petitioners attended the orientation session on August 11, 2006, but did not consider it to be an appropriate placement for the child (Tr. pp. 187, 191). I concur with the decision of the impartial hearing officer, which found that the irregularities that occurred were minor and did not rise to the level of a denial of a FAPE because respondent adequately informed petitioners of the child's placement in an expansion of an existing program and afforded them an opportunity to observe a similar program prior to the start of the 2006-07 school year (IHO Decision at pp. 5-6; Tr. pp. 512, 515).

In summary, the procedural errors asserted were either not supported by the record, or did not rise to the level of a denial of a FAPE.[4] There is no showing that any procedural error

---

[4] While I agree with petitioners' contention that the IEP does not properly identify the methods of measurement for the child's annual goals, the short-term objectives contain detailed information regarding the conditions under which each objective was to be performed and the frequency, duration and percentage of accuracy required for measurement of progress (34 C.F.R. § 300.320[a][3]; 8 NYCRR 200.4[d][2][iii]). Further, I am persuaded by the testimony of the assistant principal of the proposed placement that the child's progress towards his IEP goals would have been regularly evaluated and recorded in the child's data portfolio throughout the school year (Tr. pp. 500-02). Thus, I find that this procedural deficiency did not rise to the level of a denial of a FAPE (34 C.F.R. § 300.513[a][2]).

impeded petitioners from meaningfully participating in the formulation of their son's IEP, impeded the child's right to a FAPE or caused a deprivation of educational benefits (see Cerra, 427 F.3d at 194).

Petitioners contend that the CSE failed to consider recent psychological testing and evaluation performed by petitioners' neuropsychologist. I have carefully reviewed the McCarton evaluation report and the PALS evaluation report, both of which were reviewed by the CSE at its May 2006 meeting (Tr. pp 52-53). As more fully described below, I find that the CSE properly considered the two reports and properly decided to rely upon the more extensive test results and more detailed description of the child's performance in the McCarton evaluation report.

The child's mother testified that the CSE should not have relied upon the December 2005 McCarton evaluation report because it was not "sensitive" to her son's strengths and weaknesses, as he was frustrated by the end of the testing session and his performance was not indicative of what he was able to do (Tr. p. 159). The McCarton evaluation report clearly identifies concerns that, at the time of the evaluation, the child was resistant to testing (Parent Ex. E at p. 2). The McCarton evaluator describes this concern in detail and also specifies that the standardized test scores obtained were not an accurate reflection of the child's ability (id. at pp. 2, 7). The McCarton evaluator indicated that standardized test results should be regarded "cautiously" due to his language deficits and behavior, and he noted that the child's parents and his teacher opined that he was "capable of more than he was able/willing to display" during the evaluation session (id. at pp. 2, 7).

The school psychologist who chaired the May 2006 CSE meeting testified regarding the CSE's concerns about the abbreviated IQ score in the PALS evaluation report (Tr. pp. 53-56). With the understanding, as stated in the McCarton evaluation report, that the examiner was not able to elicit an optimum performance from the child, I find that the McCarton evaluation report provides a broader representation of the child's strengths and needs than the PALS evaluation report because more subtest results were included and greater detail is provided regarding the child's behavior and performance during the assessment. For example, the McCarton evaluation report notes that the child was more resistant to tasks he found boring or frustrating (Parent Ex. E at p. 2). Given the difficulties inherent in testing a child whose performance is inhibited by language deficits, the accuracy of the subtest scores relied upon by petitioners is of less significance in describing this child's present performance levels than a description of what the child was able to do and the type of tasks that caused him to exhibit frustration.

In addition to reviewing standardized test scores, I have compared descriptions of the child's performance in the two reports. While the McCarton evaluation report provides a more detailed description of the child's performance on specific tasks and the conditions that elicited that performance, the difference between the descriptions of the child in the two reports does not establish that the McCarton evaluation report contains inaccurate information. Both reports describe the child's attention as "variable" (Parent Exs. D at p. 2; E at p. 2). The McCarton evaluation report states that the child "demonstrated the ability to sustain direct eye contact with the examiner, but he looked away as a means of avoiding a demand" (Parent Ex. E at p. 2). The PALS evaluation report similarly notes "limited eye contact" (Parent Ex. D at p. 2). Both reports also state that the child used single words or word approximations to indicate his needs (Parent Exs. D at p. 2; E at p. 3). The McCarton evaluation report shows that the child responded to simple directions, but required several attempts before responding to his name (Parent Ex. E at p.

3). The PALS evaluation report indicates that repetition was required for all tasks (Parent Ex. D at p. 2). The McCarton evaluation report states that the child was able to name objects and actions and repeat sentences of up to two words (Parent Ex. E at pp. 3-4); and the PALS evaluation report states that he "demonstrated some labeling abilities and was able to spontaneously make simple requests," but that his use of language was "limited" (Parent Ex. D at p. 2). The McCarton evaluation report indicates that the child was able to complete simple puzzle shapes, placing geometric forms in a board (Parent Ex. E at p. 4); and the PALS evaluation report states that the child was able to match blocks to model designs when the designs were modeled for him (Parent Ex. D at p. 3).

I note that the child's mother described her son's cognitive potential in relation to IQ scores obtained during the PALS evaluation (Tr. p. 355). While the apparent increase in measured cognitive ability identified by the abbreviated IQ score reported in the PALS evaluation report is an encouraging indicator that the child has greater "potential," the CSE is responsible to develop an IEP that adequately describes a child's present functioning at the time the IEP is developed.

Petitioners assert that the CSE relied upon outdated and inaccurate information regarding their son's performance that did not reflect his significant progress between December 2005 and May 2006. An IEP must reflect a child's present levels of performance (8 NYCRR 200.4[d][2][i]; see 34 C.F.R. § 300.320[a][1]). Petitioner testified that she provided the May 2006 CSE with copies of a March 2006 progress report from CDC, which demonstrated the child's progress since the December 2005 progress reports were submitted by the child's CDC providers. She indicated that the March 2006 progress report supported placement of her son in a program with higher functioning children, asserting that he had made significant progress in the months between the December 2005 progress reports and the May 2006 CSE meeting (Tr. pp. 153, 155-56, 161-62). Petitioner testified that the CSE read the March 2006 progress report, but chose instead to rely upon information in the December 2005 progress reports (Tr. pp. 166-68).

The March 2006 progress report to which petitioner referred in testimony was not offered into evidence. Consequently, I cannot review it to determine whether it reflected a change in the child's performance sufficient to warrant the CSE's consideration of different goals and objectives or of a different type of placement for petitioners' son.

Petitioners next assert that the May 2006 IEP was deficient because the goals and objectives were not appropriate for the child. The child's mother reviewed the May 2006 goals and objectives and testified that "in many cases" the short term objectives on the May 2006 IEP had already been achieved (Tr. p. 183). Finding fault with the CSE for not relying on information developed after the December 2005 progress reports, she stated that the child's goal to develop play skills reflected needs identified in January and February 2006 (Tr. p. 176; Parent Ex. B at p. 8). She testified that the child continued to demonstrate sensory deficits and that the IEP's goal for sensory processing included an objective for not bumping into others, which was "still an issue for him once in awhile" (Tr. pp. 178-79; Parent Ex. B at p. 9). She also testified that, while the child had learned the names of his classmates and would greet them by name, he had difficulty with this skill in new settings (Tr. p. 181-82). The IEP's inclusion of a socialization objective for greeting peers by name would have addressed this need in the child's 2006-07 placement (Parent Ex. B at p. 10). Her testimony that the child was not yet able to make

11

friends outside of a structured setting and had not developed social reciprocity is consistent with IEP socialization objectives addressing initiating peer interaction and turn taking (Tr. pp. 202-03; Parent Ex. B at p. 10)

Having determined that the May 2006 IEP accurately reflects the child's present performance levels, I now turn to the IEP goals and objectives developed by the CSE on the basis of those levels of performance. In the academic domain, the May 24, 2006 IEP identifies specific skills the child was able to perform and concepts for which he had demonstrated mastery (Parent Exs. B at pp. 3, 5; F at p 4). It notes that he was able to sort, match and label objects (Parent Ex. B at p. 5) and is reflective of the teacher reports that the child could rote count to ten, recite the alphabet and recognize letters, his name, and the names of classmates (Parent Ex. F at p. 4). The IEP's statement of the child's academic performance notes that the child was performing at the pre-kindergarten level (Parent Exs. B at p. 3; F at p. 4). Reflective of teacher descriptions of the child as "frequently distracted" (Parent Ex. F at p. 4), the IEP recommends preferential seating and refocusing and redirection as needed (Parent Ex. B at p. 3).

The May 24, 2006 IEP also reflects the descriptions of the child's speech and language abilities as reported by the speech-language therapist's who provided services to the child and includes a description of the impact of the child's apraxia upon his expressive language (Parent Exs. B at p. 4; I at p. 2). Goals and objectives for expressive language reflect the child's emerging ability to make requests and to produce familiar phrases, as described by both the special education teacher and the child's speech-language therapist (Parent Exs. B at pp. 11, 13; F at pp. 2-3; I at p. 2). Goals and objectives for increasing the child's receptive language skills reflect information in the record regarding the child's present performance levels in understanding basic concepts and following simple directions (Parent Exs. B at pp. 11, 13; F at pp. 2-3; I at p. 3). Goals and objectives for production of speech sounds reflect the speech-language therapist's description of the child's present performance in oral motor movement, vowel and consonant production and use of fricatives (Parent Exs. B at p. 14; I at p. 1).

In the physical domain, the May 24, 2006 IEP goals and objectives reflect information in the record regarding the child's present performance levels and address his identified deficits in motor planning, sensory processing and functional use of gross and fine motor skills (Parent Exs. B at p. 12; G at p. 2). Corresponding goals and objectives in the classroom reinforce occupational therapy goals and also include an objective to address the child's identified difficulties with focus and attention (Parent Exs. B at p. 9; F at p. 4; G at p. 2).

In the social-emotional domain, the counseling goal in the May 24, 2006 IEP addresses the child's identified difficulty coping with frustration and his emerging skills in initiating interaction with peers (Parent Exs. B at p. 15; F at p. 2). Classroom goals in the social-emotional domain parallel the counseling goal for peer interaction in the classroom setting and capitalize upon the child's identified enjoyment of music by incorporating songs into peer activities in which the child would have been expected to participate (Parent Exs. B at p. 10; F at p. 3).

Upon review of the May 24, 2006 IEP, I find that it was reflective of the information available to the CSE at the time the IEP was developed and addresses the child's identified needs by recommending appropriate, measurable goals and objectives and by recommending services consistent with those goals and objectives. In developing the IEP, the CSE relied upon information provided by individuals who were, at the time, working with the child on a daily

12

basis. Although some of the progress reports reviewed at the May 24, 2006 meeting were completed in December 2005 and petitioners assert that their child had made significant progress since the completion of those reports, I find that a subsequent letter from the child's teacher at CDC, dated June 9, 2006 describing the child's performance does not support petitioners' assertion that their child had gained skills at a level that resulted in an inaccurate description of his performance or goals that did not reflect his needs (Parent Ex. N at pp. 5-6).

While the goals themselves are generally stated, I find that the objectives are specific and appropriately reflective of all descriptions in the record of the child's performance. I also find that the objectives contain detailed information regarding the conditions under which each objective was to be performed and the frequency, duration and percentage of accuracy required for measurement of progress.

Turning to petitioners' assertion that their son required a placement appropriate to the child's behavior needs, I note that the mother's testimony that by spring 2006 the child was able to express his feelings instead of acting out and that his "difficult behavior period" had subsided in April and May 2006 as he demonstrated an increased ability to understand (Tr. pp. 151-52; 155-56) and petitioners' assertion that the child would have been inappropriately placed in a 6:1+1 class with other children who have behavioral needs are inconsistent with petitioners' contention that the child had behaviors that substantially interfered with the educational process and that the IEP failed to indicate this. Also, I note that the record indicates that CDC requested a one-to-one "management para" for the child in April 2006 because he exhibited "dangerous behaviors" such as running out of the classroom (Tr. p. 69; IHO Ex. 1). I find that the testimony of the school psychologist who chaired the May 2006 CSE meeting that the failure to indicate the child's behavior level on the IEP was an oversight was persuasive (Tr. p. 83; Parent Ex. B at p. 6). In addition, I find that the IEP addressed the child's behavioral needs that were identified in both the PALS evaluation report and the McCarton evaluation report by recommending preferential seating, refocusing and redirection as needed, and including objectives for maintaining the child's focus during various activities (Parent Exs. B at pp. 3, 8, 9, 10; D at p. 2; E at p. 2). Further, I am persuaded by the assistant principal of the proposed placement who testified regarding her knowledge of the four 6:1+1 classes and indicated that each child was observed upon entry into the program in order to identify current needs (Tr. pp. 524-30, 548). The assistant principal testified that the child's behavior would have been taken into consideration had he attended respondent's school (Tr. pp. 529-30). She described the qualifications of the staff, the availability of additional experts in autism who assisted the teachers and aides, and the use of Treatment and Education of Autistic and Communication Handicapped Children (TEACCH) methodology (Tr. pp. 491, 493-98, 502, 504). I find that her description supports respondent's claim that the recommended program would have addressed the child's behavioral needs (see Application of a Child with a Disability, Appeal No. 07-012).

For the foregoing reasons, I am not persuaded by petitioners' argument that the May 2006 IEP did not adequately describe the child's present performance levels or include goals and objectives to address his special education needs.

I now turn to petitioners' assertion that the proposed 6:1+1 program was not appropriate for the child because he would not be appropriately grouped with other children at his functional level. The assistant principal from the recommended placement knowledgeably testified about the program in which the child would have been placed, stating that she was in each of the

13

classrooms on a daily basis and knew all of the students by name (Tr. p. 482). She testified that the program had four 6:1+1 classes for students who were classified as having autism and that the classes had students who performed functionally from kindergarten through second grade (Tr. p. 516). The assistant principal explained that a child recommended for the program by the CSE was not recommended for a specific classroom, as that decision was made by program staff (Tr. p. 528). Classroom groupings were developed on the basis of present performance levels described on each child's IEP (Tr. p. 528).

The assistant principal provided a general description of the ability levels of the children in each of the four classes (Tr. pp. 537-39). She stated that she had not been involved in the decision to place petitioners' son in a specific class and she indicated that the children in the proposed class were nonverbal (Tr. pp. 539-40). When she was advised that the child was able to speak, the assistant principal testified that the child could have been placed in another class with verbal children (Tr. pp. 540-41). Given the range of functional abilities from kindergarten to second grade in the four classes at the recommended placement and the opportunity available to move the child to another class if he were found to be inappropriately grouped, I find that respondent recommended a program which could have provided both a suitable classroom grouping and the flexibility to adjust that grouping as the child's needs changed.

I conclude that the IEP was reasonably calculated to enable the child to receive educational benefit (Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 382 [S.D.N.Y. 2006]; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). Therefore, I concur with the impartial hearing officer's finding that respondent offered the child an appropriate program for the 2006-07 school year. Having determined that the child was not denied a FAPE for 2006-07 school year, it is not necessary for me to consider the appropriateness of the program petitioners obtained for their son, or whether the equities support their claim for tuition reimbursement (see Voluntown, 226 F.3d at 66).

Although not required to do so, in this case I will consider petitioners' assertions with regard to the second Burlington criterion. I note that I have reviewed the testimony of the child's teacher at Forum and the Forum goals and objectives for the 2006-07 school year, and I conclude that the information in the record does not support petitioners' claim that Forum was an appropriate program for the child. Forum is providing the child with speech-language therapy three times per week for 20 minute sessions, a significant reduction of services that petitioners assert their son requires (Tr. pp. 276-77). Occupational therapy, another identified need, is not available at Forum and is provided through a private contractor (Tr. p. 264). Counseling, identified as necessary to address the child's socialization deficits related to his language deficits, is not provided at Forum (Tr. p. 324), despite identified difficulties with socialization at Forum (Tr. p. 453).

The child's mother and the private evaluator from PALS testified extensively regarding the impact of the child's apraxia upon his performance. The PALS evaluator recommended a language-based program and testified that he had recommended Forum (Tr. p. 364; Parent Ex. D at p. 4). The child's mother testified that she disagreed with her son's autism classification and indicated that because apraxia was his primary deficit, he would be more appropriately classified as speech and language impaired (Tr. pp. 143-45, 199-200, 236-39). She testified that she had selected Forum because it was a school that was designed to address her son's language deficits (Tr. pp. 193-94).

14

As noted previously, the CSE identified the child's needs and developed goals and objectives with regard to the child's apraxia. The record also contains the child's speech and language goals from Forum (Parent Exs. K at pp. 18-19; N at pp. 1-4). While a private placement is not required to develop goals and objectives, I note that Forum's goals and objectives for the child address vocabulary, sentence structure, following directions, answering wh- questions, conversational skills and articulation, but not oral motor movements or sound production that would address the child's diagnosis of apraxia (Parent Ex. N). In addition, the description of the child's learning characteristics do not address the child's diagnosis of apraxia (id. at p. 4).

The child's teacher at Forum described the child's presenting problems as "probably all behavioral like compliance, listening to directions" and she did not identify his language needs or his apraxia (Tr. p. 434). When describing a typical day in her classroom, the teacher gave a synopsis of the day's activities, including unpacking the child's backpack, use of a behavior chart, cutting with scissors, practice writing his name, morning circle, group activities and free time, but with the exception of a reference to singing, the teacher did not identify any activities related to language or to how she addressed this alleged primary area of need during the school day (Tr. pp. 436-37). Moreover, the teacher opined that the child's primary difficulty was with compliance, and she testified that she had not incorporated many speech-language services into her classroom activities (Tr. p. 455). Given the significant testimony regarding how the child's behavior and frustration is directly related to his communication deficits, I am not persuaded that the program at Forum would appropriately address the child's special education needs.

I have examined petitioners' remaining contentions and find them to be without merit.

**THE APPEAL IS DISMISSED.**

Dated:   Albany, New York
         May 11, 2007

PAUL F. KELLY
STATE REVIEW OFFICER