UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
ROCHELLE TARLOWE, and SETH JONAS,                           :
collectively and individually, and on behalf of             :
ZACHARY JONAS, a minor,                                     :
                                                            :
                        Plaintiffs,                         :
                                                            :           07 Civ. 7936 (GEL)
        -v.-                                                 :
                                                            :           **OPINION AND ORDER**
NEW YORK CITY BOARD OF EDUCATION,                           :
d.b.a NEW YORK CITY DEPARTMENT OF                           :
EDUCATION, and JOEL KLEIN, in his official                  :
capacity as Chancellor of the New York City                 :
School Districts,                                            :
                                                            :
                        Defendants.                         :
                                                            :
------------------------------------------------------------x

Jesse Cole Foley, Skyer, Castro, Foley, and
Gersten, New York, NY, for plaintiffs.

Michael A. Cardozo, Corporation Counsel of the
City of New York (Andrew J. Rauchberg, Of
Counsel), New York, NY, for defendants.


GERARD E. LYNCH, District Judge:

        The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq., requires

states to provide a "free appropriate public education . . . to all children with disabilities."

Where a public school system fails to do so, parents may place their child in a private school and

seek reimbursement. Plaintiffs Rochelle Tarlowe and Seth Jonas, parents of Zachary Jonas, did

exactly that, but an Impartial Hearing Officer of the defendant New York City Department of

Education, found that a free appropriate public education had been available and denied

reimbursement. After the State Education Department's State Review Officer affirmed the

decision of the Impartial Hearing Officer, plaintiffs brought this action to seek reimbursement. Both parties have moved for summary judgment. For the reasons set forth below, plaintiffs' motion is denied and defendants' motion is granted.

## BACKGROUND

### I.    Statutory Framework

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., requires states to provide a  "free appropriate public education . . . to all children with disabilities," id. § 1412(a)(1)(A). The term "free appropriate public education" encompasses both "special education and related services." 20 U.S.C. § 1401(9). A "special education" is an education "specially designed . . . to meet the unique needs of a handicapped child." Id. § 1401(9). "Related services" include "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." Id. § 1401(26).

Although the IDEA "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children," it "imposes significant requirements to be followed in the discharge of that responsibility." Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 183 (1982). To determine what services are appropriate, states must develop an "individualized education program" ("IEP") for each child. 20 U.S.C. § 1412(a)(4). In New York, a Committee on Special Education ("CSE") in each school district is responsible for the development of an IEP. N.Y. Educ. L. § 4402(1)(b)(1). Under both federal and state law, this CSE must include the child's parents, a special education teacher, a representative from the local educational agency, and, "if the child is, or may be, participating in

2

the regular education environment," a general education teacher. 20 U.S.C. § 1414(d)(1)(B); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a).

The IDEA establishes three levels of review for challenging the adequacy of an IEP. Parents' first step is to request an "impartial due process hearing" from the local educational agency. 20 U.S.C. § 1415(f). If parents are not satisfied with the outcome of the hearing, they may appeal to the state educational agency. Id. § 1415(g). If parents are dissatisfied with the state decision, they may bring an action in either state or federal court. Id. § 1415(i)(2); see also Schaffer v. Weast, 546 U.S. 49, 54 (2005). Parents may bring such an action only after they have exhausted the state review process. Polera v. Bd. of Educ. of Newburgh Enlarged City School Dist., 288 F. 3d 478, 481 (2d Cir. 2002). During the pendency of these proceedings, parents have three options as to their child's educational placement. They can allow the child to remain in his or her current placement, 20 U.S.C. § 1415(j); they can enroll their child in the newly recommended placement, id; or they can place their child in a private school and seek reimbursement, 20 U.S.C. § 1412(a)(10)(C).

The right to reimbursement is not automatic, and "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." School Comm. of the Town of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 373-74 (1985). To succeed on a claim for reimbursement, parents must show: (1) that the services offered by the board of education were "inadequate or inappropriate"; (2) that the services selected by the parents were "appropriate"; and (3) that "equitable considerations" support the parents' claim for reimbursement. Bettinger v. New York City Dept. of Educ., No. 06 CV 6889, 2007 WL 4208560, at *4 (S.D.N.Y. Nov. 20,

3

2007), citing <u>Burlington</u>, 471 U.S. at 367-70.  Parents bear the burden of proof as to each of

these elements.  <u>Schaffer</u>, 546 U.S. at 62.

## II.    Factual and Procedural Background

Although "[t]he record is sparse regarding the child's early educational history" (SRO

Decision 2), the following facts are not in dispute.  Zachary Jonas was born on May 7, 2001.

(IHO Ex. D at D1.[1])  When he was one year and nine months old, he began to receive early

intervention services to address what a pediatric neurologist found to be a range of

developmental delays in his language and play skills.  (IHO Hr'g Tr. 142.)  At age two and a

half, a second pediatric neurologist diagnosed Zachary with pervasive developmental disorder –

not otherwise specified ("PDD-NOS").  (SRO Decision 2.)  When Zachary was three and a half,

he received a diagnosis of developmental dyspraxia, which is a speech disorder that "made it

difficult for him to control the oral motor movements necessary for speech production."  (<u>Id</u>.)

In 2004, the Committee on Preschool Special Education ("CPSE")[2] placed Zachary in a

mainstream preschool program (that is, one not designed for students with special needs),

although he continued to receive supplementary services, including speech, language, and

occupational therapies.  (SRO Decision 2; IHO Hr'g Tr. 145-47.)  In 2005, the CPSE changed

his placement to the Center for Child Development ("CDC"), a special needs preschool.  (SRO

---

[1] "IHO Exhibits" are exhibits entered into evidence at the hearing before the Independent
Hearing Officer ("IHO").  Because they contain confidential information, these exhibits were
filed under seal with this Court.

[2] In New York State, every school district has both a CPSE and a CSE.  The CPSE is
responsible for identifying appropriate services for children ages three to five, and the CSE
identifies such services for children ages five to twenty-one.  New York State Office of
Education and Vocational Services for Individuals with Disabilities, *Special Education in New
York State for Children Ages 3-21, A Parent's Guide,* May 2002,
http://www.vesid.nysed.gov/specialed/publications/policy/parentguide.htm#InRef.

Decision 2.)

In December 2005, Zachary underwent a private evaluation by Dr. Cecilia McCarton, who administered a series of intelligence, behavior, and developmental tests. (Id. at 4.) One test was the complete Stanford-Binet Intelligence Scale - Fifth Edition ("SB5"), on which Zachary received "very low range" verbal, nonverbal, and overall IQ scores. (Id.) The evaluation categorized Zachary as having an autism spectrum disorder, as well as speech and language deficits. (Id. at 5.) The evaluation also indicated that Zachary had difficulty focusing, and that he had been "very easily distracted and frustrated" during the evaluation. (Id. at 4.) The evaluation cautioned that Zachary's speech and language problems had made it difficult for him to understand and comply with instructions given during the evaluation, and together with his distractibility, this had negatively affected his performance on the standardized tests. (Id. at 5.) Thus, he was likely "capable of more than he was able/willing to display" during the evaluation session. (Id.)

To help get a more accurate picture of Zachary's "potential," plaintiffs sought a second evaluation. (IHO Hr'g Tr. 159-60.) In April and May 2006, Zachary underwent an evaluation by Dr. David Salsberg. (SRO Decision 5.) The Salsberg evaluation administered just two subtests of the SB5, plus some other tests not administered by Dr. McCarton. (Id.) The Salsberg evaluation sought to "control for some of the more significant language issues" identified in the McCarton evaluation (IHO Hr'g Tr. 355), for example, through "repetition, and at times rephrasing of oral instructions" (IHO Ex. D at D2). On one of the SB5 subtests – one that tested verbal knowledge – Zachary scored approximately the same as he had on the McCarton evaluation, in the "very low range." (IHO Hr'g Tr. 357.) However, on the other SB5 test – one

that tested nonverbal reasoning – Zachary scored substantially higher, in the "average" range for a child his age. (Id. 357-59.) Overall, Zachary had an "Abbreviated IQ" score in the "low average" range. (IHO Ex. D at D3.) Like the McCarton evaluation, the Salsberg evaluation concluded that Zachary's test scores did not accurately reflect his "abilities and potential" because of "his significant language disabilities." (Id. at D2.)

As Zachary would be entering the public school system for the first time, the CSE convened a meeting on May 24, 2006, to develop an IEP for Zachary's 2006-07 kindergarten year. (Def.'s R. 56.1 Statement ¶ 2.) Present for the meeting were Zachary's parents, his CDC special education teacher, his CDC social worker, a Department of Education ("DOE") school psychologist, a parent advocate, and a special education teacher designated by the DOE. (IHO Ex. B at B2.) The CSE considered "education reports and teacher input." (SRO Decision 6.) The IEP developed by the CSE classified Zachary as autistic (IHO Ex. B at B1), with delayed speech and language skills that impeded his ability to fully participate in classroom activities and interact with his peers (SRO Decision 6). It found that Zachary's reading, writing, and math skills were at a pre-kindergarten level, though he had made progress in all areas and demonstrated an understanding of several concepts from preschool. (Id.) The IEP found Zachary to be "sweet and friendly," though also "highly distractible" and "easily over-stimulated," requiring "intense adult support to maintain focus on tasks" and a "small class-size in a calm environment." (IHO Ex. B at B5, B6.) The CSE recommended a twelve-month school year program consisting of a 6:1+1[3] special class in a specialized school, as well as speech-

---

[3] The term "6:1+1" refers to the ratio of students to teaching professionals, in this case, six children to one teacher, plus one paraprofessional, responsible for providing extra supervision for a child requiring additional attention. (See IHO Hr'g Tr. 115.)

6

language therapy, occupational therapy, and counseling.  (SRO Decision 6.)  The IEP did not identify the specific school where Zachary would be placed.  (Id.)

On June 16, 2006, after the CSE meeting, but before learning of Zachary's specific placement, plaintiffs placed a non-refundable ten percent deposit with the Forum School ("Forum"), a special needs private school located in New Jersey.  (Def.'s R. 56.1 Statement ¶ 7.) Due to miscommunication by the DOE, plaintiffs did not learn of Zachary's placement until August 2006, when they received an invitation from the DOE to attend a parent orientation. (SRO Decision 6.)  The DOE explained that the orientation would include an opportunity to observe a classroom that would be similar to the one in which it intended to place Zachary.  (Id.)

Plaintiffs attended the orientation session on August 11, 2006, but were not satisfied with what they saw.  (Id.)  By notice dated August 15, 2006, plaintiffs requested an impartial hearing from the DOE, alleging that the educational agency had failed to provide Zachary with a free appropriate public education.  (Pl.'s R. 56.1 Statement ¶ 1.)  Plaintiffs subsequently enrolled Zachary at Forum.  (IHO Decision 2, 4.)  After three days of testimony in the fall of 2006, the IHO concluded that the DOE had complied with the IDEA because it had made available a free appropriate public education for Zachary.  (SRO Decision at 7.)  In May 2007, the SRO affirmed the decision of the IHO.  (Def.'s R. 56.1 Statement ¶¶ 21-22.)

Pursuant to 20 U.S.C. § 1415(i)(2)(A), plaintiffs initiated the present action.

**DISCUSSION**

I.    **Standard of Review**

      A.    <u>Qualified Deference to Administrative Proceedings</u>

      The IDEA allows a reviewing court to exercise its independent equitable power to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  However, the IDEA"'by no means [extends] an invitation to the courts to substitute their own notions of sound education policy for those of the school authorities which they review.'" <u>M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers</u>, 231 F.3d 96, 102 (2d Cir 2000), quoting <u>Rowley</u>, 458 U.S. at 206.  Courts must "give 'due weight' to these [administrative] proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" <u>M.S.</u>, 231 F.3d at 102, quoting <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 129 (2d Cir. 1998).  Deference to the SRO is proper, for example, on "assessment[s] of educational progress" or "formulation[s] of educational programs." <u>M.S.</u>, 231 F.3d at 105.  Conversely, deference is not proper where state administrative officials are "in no better position than the district court to make conclusions" with respect to that issue. <u>Muller v. Comm. of Special Educ. of the East Islip Union Free Sch. Dist.</u>, 145 F.3d 95, 102 (2d Cir. 1998).

      B.    <u>Summary Judgment under the IDEA</u>

      In general, summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding the motion, a court must draw all "justifiable inferences" and resolve all

ambiguities in the nonmovant's favor, and construe the facts in the light most favorable to the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, on summary judgment in an IDEA action, "the existence of a disputed issue of material fact will not defeat the motion."  J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Instead, a court must base its decision on the "preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(iii); Rowley, 458 U.S. at 205.  In so doing, a court considers both the administrative record and additional evidence that the parties wish to introduce.[4]  Grim, 346 F.3d at 380.

Here, both parties seek summary judgment, and neither party disputes the appropriateness of summary judgment.  The parties differ on the merits, disputing all three elements necessary for plaintiffs to prevail.  However, because plaintiffs do not meet their burden in proving that the IEP was "inadequate or inappropriate," it is not necessary to reach the other two elements.

## II.    Appropriateness of the IEP

An IEP needs to be both substantively appropriate and developed in accordance with the procedures mandated by the IDEA.  An IEP is substantively appropriate so long as it is "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 206-07.  It does not need to "maximize" a child's educational potential.  Id. at 198-99.  While states are required to follow the procedures set forth in the IDEA in developing the IEP, failure to do so does not automatically render an IEP inadequate.  Grim v. Rhinebeck Central School

---

[4] Plaintiffs have submitted some additional evidence not presented to the IHO or SRO. (See Exhibit to Pl.'s Reply.)

Dist., 346 F.3d 377, 383 (2d Cir. 2003); see also Matrejek v. Brewster Cent. Sch. Dist., 471 F.

Supp. 2d 415, 419 (S.D.N.Y. 2007).  Such procedural failures are grounds for reimbursement

only where they "(i) impeded the child's right to a free appropriate public education; (ii)

significantly impeded the parents' opportunity to  participate in the decision making process

regarding the provision of a free appropriate public education; or (iii) caused a deprivation of

educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii); see Matrejek, 471 F. Supp. 2d at 419.

Plaintiffs contend that the IEP is inadequate on a number of procedural and substantive grounds.

     A.    Failure to Include General Education Teacher at CSE Meeting

 First, plaintiffs argue that the CSE meeting was not properly constituted because it did

not include a general education teacher.  (Pl.'s Br. 8-9.)  The IDEA requires the presence of a

general education teacher where a "child is, or may be, participating in the regular education

environment."  20 U.S.C. § 1414(d)(1)(B)(ii).

Here, plaintiffs have not proved that Zachary was being considered for participation in

the regular education environment.  At the time of the CSE meeting,  Zachary had been attending

a special needs preschool.  (SRO Decision 2; IHO Hr'g Tr. 148-49.)  Dr. Christine Goodman, a

DOE school psychologist in attendance at the CSE meeting, testified that Zachary "had been in a

very restricted special education program and to my knowledge general education was not being

considered as a program for this child."  (IHO Hr'g Tr. 48.)  Plaintiffs themselves did nothing to

suggest that general education placement be considered for their son, and Tarlowe conceded that

at the time of the meeting, she and her husband were not "considering placing [their] son in [a]

general education" program.  (IHO Hr'g Tr. 215.)

Plaintiffs' contention that general education was being considered appears to be based entirely on a statement in the IEP report that says that Zachary is not prohibited from "full participation" in "lunch, assemblies, trips and/or other school activities with non-disabled students." (IHO Ex. B at B18.) Parents cite no authority for the proposition that participation in such extra-curricular activities constitutes participation in a "regular education environment." The statute itself does not define "regular education environment." However, the statute does define "special education" as "specially designed *instruction*," 20 U.S.C. § 1401(29) (emphasis added), suggesting that a "regular education environment" would be the place where "instruction" occurs, and that the term does not primarily reference extracurricular activities.

Moreover, the statement relied upon is not a recommendation that Zachary participate in such extracurricular activities; it simply states that there is no "reason for non-participation." (Parents Ex. B at B18.) Given that the IEP elsewhere unambiguously recommends that Zachary be placed in a "special class in a special school" rather than in a mainstream school, the statement is reasonably understood as simply clearing Zachary to participate in such activities *to the extent that they are available*. As Dr. Goodman explained, Zachary's IEP "recommended a very restricted class," so the recommendation of "full participation" does not mean full participation in a regular education environment, but rather "full participation in whatever that [special needs] class does." (IHO Hr'g Tr. 50.) Plaintiffs thus have not met their burden of proving that a general education teacher's presence was required at the CSE.[5]

---

[5] Even if a general education teacher was required, plaintiffs have also failed to prove that the absence "significantly impeded" their "opportunity to participate in the decision making process." 20 U.S.C. § 1415(f)(3)(E)(ii). Tarlowe testified that despite some misgivings about the adversarial feeling of the CSE meeting, she and her husband were "given [an] opportunity to speak," they felt "comfortable" speaking during the meeting, and they had an "opportunity to

      B.    Failure to Offer a Specific Placement

Plaintiffs next argue that the DOE "failed to offer Zachary a specific placement." (Pl.'s Br. 16.) Since it is undisputed that Zachary was in fact given a placement at a specific school (SRO Decision 6), what plaintiffs appear to mean is that they were not informed of this placement in a timely manner. However, the IDEA requires only that a valid IEP be in effect "at the beginning of each school year." 20 U.S.C. § 1414(d)(2). An education department's delay does not violate the IDEA so long as the department "still ha[s] time to find an appropriate placement . . . for the beginning of the school year in September." Bettinger, 2007 WL 4208560 at *8 & n.26. Since plaintiffs were informed of the placement in early August, prior to the start of the school year, the DOE did not run afoul of this requirement. Moreover, plaintiffs offer no evidence that the delay in receiving the placement notice interfered or threatened to interfere with Zachary's ability to receive a free appropriate public education. Plaintiffs had the opportunity to attend a parent orientation prior to the start of the school year, could have enrolled him at the DOE placement, and did successfully enroll Zachary at their chosen private alternative. Without any evidence of harm or prejudice resulting from the timing of the notice, plaintiffs have not established that the failure to provide earlier notice of the specific placement denied Zachary a free appropriate public education.

      C.    Reliance on Improper Evaluative Material

      Plaintiffs next allege that the CSE failed to consider or give due weight to certain evaluative materials. The IDEA requires that a CSE consider, among other things, "the results of

---

clearly put forth what [their] position was." (IHO Hr'g Tr. 214, 218, 226.) There is no evidence that the absence of a general education teacher had any effect on the meeting.

the initial evaluation or most recent evaluation of the child," and "the academic, developmental, and functional needs of the child."  20 U.S.C. § 1414(d)(3).  Plaintiffs allege that three sets of materials were not given proper consideration.

First, plaintiffs allege that the CSE relied exclusively on the McCarton evaluation rather than the Salsberg evaluation.  (Pl.'s Br. 10-11.)  Plaintiffs contend that the Salsberg evaluation, which showed Zachary to have "good cognitive depth potential," is a better indication of Zachary's "actual cognitive ability and potential" than the McCarton evaluation because the Salsberg evaluation "broke through" the language difficulties that "negatively impact . . . the assessment of [his] other cognitive and academic skills."  (Id.)  Plaintiffs claim that the IEP is fatally flawed because it is "impossible to properly plan for proper educational placement" without taking into account the impact of Zachary's language difficulties on his cognitive assessments.  (Id. 11-12.)

Plaintiffs have not established that the CSE failed to give proper consideration to the Salsberg evaluation.  It is true that the IEP report does not explicitly mention the Salsberg evaluation.  (See IHO Ex. B.)  But Dr. Goodman testified that she read the Salsberg report and took its evaluation into consideration.  (IHO Hr'g Tr. 53-55.)  She testified that she ultimately did not rely on it because she found the evaluation to be "incomplete and inadequate" because it had used only a small number of SB5 subtests, rather than the complete battery administered by Dr. McCarton.  (Id.)  The SRO ratified Dr. Goodman's decision, finding that the CSE had "properly considered the two reports and properly decided to rely upon the more extensive test results" in the McCarton evaluation.  (SRO Decision 10.)  The SRO also found the two reports to be largely consistent in their observations and conclusions, such that any "difference between the

descriptions of the child in the two reports does not establish that the McCarton evaluation . . . contains inaccurate information." (Id.) Finally, while acknowledging that the Salsberg evaluation indicated greater underlying "potential" for Zachary than did the McCarton evaluation, the SRO nevertheless found the CSE's reliance on the McCarton evaluation to be appropriate since the CSE is responsible for developing an IEP based on a child's "present functioning at the time the IEP is developed," not on underlying "potential." (Id. 11.)

The SRO found, and the record supports, that the CSE adequately considered and gave due weight to the Salsberg evaluation. Although the contention that the Salsberg evaluation provides a better assessment of Zachary's true "potential" is not without some support, the reasons offered by the SRO for relying on the McCarton evaluation are persuasive. Since the Court "lacks the specialized knowledge and experience necessary" to assess the relative merits of the two evaluations, this is quintessentially an issue upon which the Court must defer to the expertise of the SRO. M.S., 231 F.3d at 102. See also Grim, 346 F.3d at 383 (finding it "impermissibl[e]" for a district court to choose "between the views of conflicting experts on a controversial issue of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.")

Second, plaintiffs contend that the CSE neglected to consider input from Zachary's special education teacher and social worker from the CDC, who were present at the CSE meeting. (Pl.'s Br. 12.) However, there is very little evidence of what input the CDC representatives offered the CSE. Tarlowe testified that they argued against reliance on the McCarton report, and that they told the CSE that Zachary's recent progress made the proposed IEP inappropriate. (IHO Hr'g Tr. 167-68.) And Dr. Goodman said that she "remember[ed] them

14

disagreeing" about something in the IEP, but could not "remember the substance of the discussion." (Id. 57.) There is nothing else in the record about what the CDC representatives said. The SRO persuasively explained why reliance on the McCarton report was justified, as discussed above. There is simply not enough information in the record to evaluate the merits of the argument that Zachary's recent progress made the IEP inappropriate, and whether that progress was given due weight by the CSE. That the CDC representatives argued for a position that ultimately did not prevail at the CSE does not establish that their views were not considered.

Third, plaintiffs allege that the CSE failed to consider Zachary's latest progress report from school. (Pl.'s Br. 12.) Tarlowe testified that this report was presented to the CSE, and that the members of the committee read the report. (IHO Hr'g Tr. 167.) But Tarlowe felt that the CSE's "focus" remained on the McCarton report. (Id.) Plaintiffs provide no information on what was contained in the report, other than that it showed "a lot of development" by Zachary. (Id. 168.) The report itself was never offered into evidence. (SRO Decision 11.) Thus, like the SRO below, this Court is unable to "review it to determine whether it reflected a change in the child's performance sufficient to warrant the CSE's consideration of . . . a different type of placement for [plaintiffs'] son." (Id.) The fact that the CSE focused more attention on the McCarton report than it did on this progress report is not, without more, sufficient evidence that the CSE did not adequately consider the report.

D.    Failure to Account for Behavioral Problems

Plaintiffs next argue that the IEP is inadequate because it does not properly account for Zachary's behavioral problems. (Pl.'s Br. 13.) This allegation is based on the failure of the CSE to check the appropriate box in the IEP indicating whether Zachary had any behavioral problems

that require classroom intervention.  (See IHO Ex. B at B6.)  Instead, handwritten notes nearby

indicate that Zachary "has been diagnosed as PDD/autistic," and that he is "sweet and friendly

and has developed more relatedness."  (Id.)  Based just on these notes, the section could fairly be

read as indicating that Zachary does not have behavioral issues that require intervention.

However, as Dr. Goodman conceded, Zachary does in fact have "behavioral issues" that

"interfere with the instructional process," and the CSE should have checked a box indicating

such.  (IHO Hr'g Tr. 68-69.)

    The IDEA requires that "in the case of a child whose behavior impedes the child's

learning or that of others," the IEP team must "consider the use of positive behavioral

interventions and supports, and other strategies, to address that behavior."  20 U.S.C. §

1414(d)(3)(B)(i).  A failure even to identify behavioral issues could violate this directive since it

would be impossible to design such "interventions, supports, and other strategies" without

recognition that a problem exists in the first place.  However, as the SRO explained, although the

CSE did not check the appropriate box in this section of the IEP, the report elsewhere addressed

the substance of Zachary's behavioral needs, by providing specific, concrete recommendations

to account for his behavioral problems, including "preferential seating, refocusing and

redirection as needed," and by setting "objectives for maintaining the child's focus during

various activities."  (SRO Decision 13, citing  IHO Ex. B at B3, B8, B9, B10.)  The CSE's

failure merely to check an appropriate box is not sufficient evidence that the CSE substantively

failed to account for Zachary's behavioral needs, where the substance of those needs was fairly

addressed.[6]

E.    Failure to Set Appropriate Goals and Objectives

Plaintiffs also assert that the CSE failed to set appropriate annual goals and short-term

objectives.  (Pl.'s Br. 14-15.)  The IDEA requires "a statement of measurable annual goals,"

including benchmarks or short-term objectives.  20 U.S.C. § 1414 (d)(1)(A)(i).  Plaintiffs

contend that the IEP failed to satisfy this requirement because it did not provide any "benchmark

levels of performance," "schedule for determining Zachary's progress," or "methods of

measurement." (Pl.'s Br. 14-15.)

Plaintiffs argument is not supported by the record.  The IEP contains fourteen different

annual goals for Zachary across seven different domains, and each annual goal is associated with

two to four "short-term objectives."  (IHO Ex. B at B8-B15.)  For example, in the "classroom-

physical" domain, one annual goal is to "improve [Zachary's] motor-planning abilities," and an

associated short-term objective is for Zachary to complete "a 3.5 step obstacle course with adult

assistance with 80% success."  (IHO Ex. B at B9.)  Similarly, in the "classroom-speech and

language" domain, an annual goal is to "increase his expressive language abilities," and an

_____

[6] In their reply, plaintiffs argue for the first time that the IEP was inadequate because the
CSE failed to conduct a "Functional Behavior Assessment" and the IEP did not include a
"Behavior Intervention Plan."  (Pl. Reply 1-2.)  A functional behavior assessment is required in
the development of an IEP, see N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v), but it is
simply an assessment of "why the student engages in behaviors that impede learning and how the
student's behavior relates to the environment," id. § 200.1(r).  This requirement has been met
because, as discussed above, the substance of Zachary's behavioral issues was addressed by the
IEP.
    New York law says that a CSE shall "consider" the development of a behavioral
intervention plan where any of a number of specific circumstances are present.  Id. § 200.22(b).
Plaintiffs have not proved that such circumstances are present here, nor that the CSE failed to
"consider" the development of a behavioral intervention plan.  The fact that the IEP does not
contain a behavioral intervention plan therefore does not make it inadequate.

associated short-term objective is for Zachary to "use single words to request attention or physical affection (i.e. 'Look!' 'Hug') 90% of the time."  (IHO Ex. B at B11.)  Each annual goal mandates three progress reports per year.

The Court agrees with the SRO determination that "while the goals themselves are generally stated," they contain sufficiently detailed information regarding "the conditions under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for measurement of progress."  (SRO Decision 13.)  Moreover, "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  Grim, 346 F.3d 377, 382 (2d Cir. 2003).  Since the SRO's conclusion is well supported by the record, it is entitled to deference.

      F.    <u>Failure to Group with Children of Similar Needs and Abilities</u>

Finally, plaintiffs argue that the IEP was inappropriate because it did not assign Zachary to a classroom with children of similar needs and abilities.  (Pl.'s Br. 17.)  Plaintiffs base this argument on the fact that all of the students in the classes where Zachary could have been placed were autistic.  (IHO Hr'g Tr. 516.)  In addition, when plaintiffs visited the school to which Zachary was assigned, called "P. 811M," they were told that the children in the program were largely non-verbal and "mentally retarded," and that they engaged in the repetitive behaviors associated with autism.  (IHO Hr'g Tr. 190-91.)  Dr. Salsberg testified that placing Zachary in such an environment would have been a "disaster."  (Id. 418.)  According to Dr. Salsberg, given Zachary's high cognitive and verbal "potential," he would not be challenged in such an environment, and his behavioral problems might worsen from being around classmates with

significant autistic behaviors.  (Id. 366-68; 418-19.)

         This argument is unpersuasive for two reasons.  First, it is not clear from the record that

the students in the proposed classes in fact are substantially different than Zachary.  While Dr.

Salsberg testified that there are important differences, his assessment is based on his own

evaluation of Zachary that the CSE considered but ultimately rejected.  The McCarton

evaluation, upon which the CSE relied, diagnosed Zachary as having an "autism spectrum

disorder," (SRO Decision 5), an IQ score in the "very low range" (id. 4), and verbal

communication abilities that are "highly delayed" (IHO Ex. E at E3).  Dr. Salsberg's testimony

is also based on his impressions of "one or two" of the DOE's 6:1+1 classes that he had had an

opportunity to observe in recent years.  (IHO Hr'g Tr. 367.)  By contrast, P. 811M has four

different 6:1+1 classes with students at differing levels of functioning, and the program staff

would have made a specific class assignment for Zachary based on an assessment of his

cognitive performance, speech and language abilities, and behavior.  (Id. 524-30.)  At least one

of these classes contained students who were mostly or entirely verbal.  (Id. 538.)  And the

severity of the students' autism at P. 811M covers a "wide range," indicating that Zachary could

have been placed with students with milder autistic behaviors.  (Id. 542-43.)  The SRO

concluded from these facts that the DOE had "recommended a program which could have

provided both a suitable classroom grouping and the flexibility to adjust as the child's needs

changed."  (SRO Decision 14.)  In light of the evidence of Zachary's serious developmental

delays, and of the range of abilities of the students at the school where Zachary was placed, the

Court has no basis to disturb this conclusion.

Second, even assuming that Zachary's placement would have grouped him with children of significantly different needs and abilities, plaintiffs have not met their burden of proving that such a placement would deny Zachary a free appropriate education. The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits," not that an IEP maximize a child's educational potential. <u>Rowley</u>, 458 U.S. at 198-99, 207. Dr. Salsberg's testimony suggests that the placement would not have enabled Zachary to receive educational benefits. But his testimony must be weighed against other substantial evidence of benefit. There is no dispute that Zachary suffers serious developmental delays and has behavioral problems that require significant individualized attention. In many important ways, the IEP placement addressed these needs. It offered him the 6:1+1 class size and instructor attention that plaintiffs acknowledge his academic and behavioral needs demand. (IHO Hr'g Tr. 228.) It would have provided him with instruction from a classroom teacher – as well as from instructors in speech, art, music and other specialized areas – designed to meet the individualized goals set forth in the IEP. (IHO Hr'g Tr. 497-98.) The program also offered individual sessions in speech and language therapy, occupational therapy, and counseling, as recommended by the IEP (<u>id</u>. 490), and regular assessments in areas such as social skills, oral language, and written language to track Zachary's progress (<u>id</u>. 500-01). Teachers at the program have opportunities for weekly and monthly training in new educational methods. (<u>Id</u>. 504.) In light of the substantial resources that would have been available to Zachary, the Court does not find reason to disturb the SRO's conclusion that the IEP was "reasonably calculated" to enable Zachary to receive "educational benefits." (SRO Decision 14.)

Accordingly, plaintiffs have not met their burden of proving that the IEP was not reasonably calculated to confer educational benefits. Although this Court recognizes the difficulty of plaintiffs' situation and appreciates their good-faith efforts to provide for their son's educational needs, their request for reimbursement must be denied.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is denied, and defendants' cross-motion for summary judgment is granted. Plaintiffs' complaint is dismissed in its entirety.

SO ORDERED.

Dated: New York, New York
July 3, 2008

GERARD E. LYNCH
United States District Judge

21